**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/2/2022
```

CIT BANK, N.A.,

                Plaintiff,

      - against -

RAMON NERIS, et al.,

                Defendants.

**18 Civ. 1511 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff CIT Bank, N.A. ("CIT Bank") brought this residential mortgage foreclosure action against Ramon Neris ("Neris") pursuant to the New York Real Property and Proceedings Law ("RPAPL"). The Court conducted a bench trial on February 28, 2022, to adjudicate CIT Bank's claims. The parties also submitted post-trial letters addressing Neris's arguments that CIT Bank failed to comply with the RPAPL's notice requirements. (See "CIT Letter," Dkt. No. 75; "Neris Letter," Dkt. No. 76.) The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT[1]

On May 1, 2006, Neris purchased the property at 64 Clinton Place, Bronx, New York 10453 ("Property"). Neris

---

[1] The factual recitation that follows derives from the Trial Transcript ("Tr.") and CIT Bank's exhibits admitted at trial ("CIT Exhibits" or

1

resides at and operates a religious ministry out of the Property. On August 15, 2007, Neris obtained a $451,250 loan from IndyMac Bank, F.S.B. ("IndyMac"). To evidence the loan, Neris executed a fixed/adjustable-rate note, dated August 15, 2007 ("Note"). Neris secured the loan by executing a mortgage agreement with IndyMac, also dated August 15, 2007 ("Mortgage"). Over a year later, on October 27, 2008, the Mortgage was duly recorded in the real estate records of the Office of the City Register of the New York City Department of Finance.

Stephanie Schulte ("Schulte"), a CIT Bank employee, testified that the Note and Mortgage were assigned and physically delivered to OneWest Bank, FSB ("OneWest"), after OneWest purchased certain assets from IndyMac. Schulte further testified that CIT Bank merged with OneWest in 2015, and that CIT Bank physically possessed the Note, via its custodian Deutsche Bank, when it commenced this action in 2018. Schulte stated that the allonges to the Note were updated between 2019 and early 2020 to reflect both the endorsement to CIT Bank, after the assignment to OneWest, and CIT Bank's merger with OneWest. The allonges were updated due to a potential CIT Bank loan sale that was never completed.

---

"CIT Ex."). No further citations to these sources will be made herein except as specifically cited.

2

In December 2016, CIT Bank and Neris executed a Home Affordable Modification Agreement ("Loan Modification Agreement") regarding the Note and Mortgage. The Loan Modification Agreement required Neris to pay a three percent fixed interest rate on a balance of $431,063.61 on the Note effective January 1, 2017.[2] However, by June 1, 2017, Neris stopped making payments in accordance with the Note, Mortgage, and Loan Modification Agreement.

CIT Bank sent Neris several notices about the risk of foreclosure on the Property. Schulte testified that, on September 26, 2017, CIT Bank mailed a notice to Neris that stated he was at risk of foreclosure and that CIT Bank could commence legal action if Neris did not take any actions to resolve the matter in 90 days ("90-Day Notice"). The 90-Day Notice further stated that, as of September 26, 2017, Neris was 117 days and $8,636.16 in default. Schulte further testified that, on September 27, 2017, CIT Bank mailed a notice to Neris that stated he was in default and that Neris had until October 30, 2017, to cure the default by paying $8,636.16 to CIT Bank ("30-Day Notice").

---

[2] According to the terms of the Loan Modification Agreement, Neris owed a modified principal balance of $615,803.73 ("Modified Principal Balance"), but $184,741.12 of the Modified Principal Balance was treated as non-interest-bearing principal. The remainder ($431,062.61) was to be treated and referred to as interest bearing principal.

3

Schulte stated that CIT Bank sent the 30-Day and 90-Day Notices by providing the relevant loan information to a third-party vendor, Covius, formerly known as Walz ("Covius"), which then sent the Notices to Neris. She explained that CIT Bank would send all the relevant loan information and a template to Covius, which would generate the letters and mail them on behalf of CIT Bank. Schulte also stated that the 30-Day and 90-Day Notices were each sent to Neris through both first-class and certified mail (i.e., four individual envelopes).

Keith Nichols ("Nichols"), an employee from CIT Bank's loan servicer, Loancare LLC ("Loancare"), also testified to the specific procedures Covius follows when mailing out loan payment notices. In December 2021, Nichols received a training on Covius's procedures for mailing out notices to borrowers, which have remained consistent since approximately 2011. He explained that for notices mailed to borrowers, a loan servicer (e.g., CIT Bank) first sends Covius an encrypted transmission of the relevant loan information. Covius has a template for any notices, which is preapproved by a particular loan servicer. Covius then uses the relevant loan information to generate the individual notices based on the preapproved template. After the relevant loan information is incorporated into the template, the letter is printed, placed into an

4

envelope, and then dropped in a bin to be mailed. Once a letter is mailed, Covius sends the servicer a scan of the printed letter, which is uploaded into a tracking system. Nichols further testified that the 30-Day and 90-Day Notices to Neris were sent by both certified and first-class mail, and the letters would have been sent in four separate envelopes.

Nichols also testified that the Note and Mortgage went into default on June 1, 2017. Based on Loancare and CIT Bank's records, Nichols explained that Neris owed the following amounts on the Note and Mortgage:

- Total principal balance: $613,452.36;

- Total interest amount from May 1, 2017 through February 28, 2022, at 3% per annum: $62,042.85;

- Total amount owed from escrow advances: $38,452.64; and

- Per diem interest rate: $35.24.

## II. CONCLUSIONS OF LAW

A. PRIMA FACIE CASE FOR A MORTGAGE FORECLOSURE

To establish a prima face case in a mortgage foreclosure action under New York law, the plaintiff must produce (1) the mortgage, (2) the unpaid note, and (3) evidence of default. See CitiMortgage, Inc. v. Moran, 135 N.Y.S.3d 378, 380 (App. Div. 1st Dep't 2020) ("Plaintiff demonstrated its prima facie entitlement to foreclosure by producing the notes, mortgages,

5

and evidence of defendant's default."); Wells Fargo Bank, N.A. v. Ullah, No. 13 Civ. 485, 2015 WL 3735230, at *4 (S.D.N.Y. June 15, 2015). A "[w]ritten assignment of the note or physical delivery of the note is sufficient to establish standing." US Bank Nat. Ass'n v. Richards, 65 N.Y.S.3d 178, 180 (App. Div. 1st Dep't 2017). A plaintiff may establish its standing to commence a foreclosure action by submitting, with its complaint, "a copy of the mortgage, a copy of the note, indorsed in blank, on which it is undisputed that defendant defaulted, and a copy of the mortgage assignment." Bank of N.Y. Mellon v. O'Callahan, 140 N.Y.S.3d 504, 504-05 (1st Dep't 2021); CitiMortgage, 135 N.Y.S.3d at 380 ("Plaintiff established standing by attaching copies of the first, second, and consolidated notes to the complaint.").

The Court previously found that CIT Bank satisfied the first two elements by attaching the original Note and Mortgage, along with the C.P.L.R Section 3012-b Certificate of Merit, to CIT Bank's Complaint. See CIT Bank, N.A. v. Neris, No. 18 Civ. 1511, 2019 WL 6334894, at *2 (S.D.N.Y. Nov. 1, 2019) (citing Dkt. Nos. 53-2, 53-3). CIT Bank established these elements again at trial. Schulte identified CIT Bank's Exhibit 3 as an assignment of the Mortgage from IndyMac to OneWest, and that OneWest later merged with CIT Bank in 2015. (See Tr. at 21:11-22:11; CIT Ex. 3.) Schulte

6

further testified that CIT Bank physically possessed the Note after it merged with OneWest in 2015, and that CIT Bank has since then retained physical possession, via its custodian Deutsche Bank. (See Tr. at 22:9-10, 29:17-21, 83:3-6); see PNC Bank, Nat'l Ass'n v. Salcedo, 77 N.Y.S.3d 370 (App. Div. 1st Dep't 2018) (holding plaintiff had standing based on affidavit establishing physical possession of endorsed note prior to commencement of the action, despite factual issues with undated allonges and deficient written assignment).

At trial, CIT Bank also established that Neris defaulted on the Note and the resulting damages owed to CIT Bank. Nichols testified that, based on Loancare's records, specifically Exhibits 18 and 19, Neris went into default on June 1, 2017. (See Tr. at 97:16-24, 110:2-111:9, 114:7-10; CIT Exs. 18, 19.) Neris also testified that he stopped making payments, although he could not recall when. (See Tr. at 88:7-12, 89:3-90:2.) Furthermore, based on Loancare's records, specifically Exhibits 19, 20, and 21, Nichols explained that Neris owed the amounts on the Note set forth above. (See Tr. at 114:12-18, 116:9-25, 118:16-17; CIT Exs. 19-21.) Given the above evidence, the Court finds that CIT Bank has established a prima facie case for foreclosing on the Property.

B. STATUTORY NOTICE REQUIREMENTS

Neris argues that this foreclosure action should nonetheless be dismissed because CIT Bank has failed to comply with the requirements of Section 1304 of the RPAPL. (See Neris Letter.) Section 1304 requires a mortgage lender, assignee, or mortgage loan servicer to notify borrowers at least 90 days before commencing a foreclosure action. In particular, Section 1304(1) sets forth specific paragraphs of information that all notices "shall include" ("Mandated Language"). RPAPL § 1304(1). Section 1304(2) adds a requirement that "notices required by this section shall be . . . in a separate envelope from any other mailing or notice." Id. § 1304(2). This provision of Section 1304(2) is known as the "separate envelope" rule.

Proper service of a Section 1304 notice "is a condition precedent to the commencement of a foreclosure action, and [a] plaintiff has the burden of establishing its strict compliance with this condition." HSBC Bank USA v. Rice, 63 N.Y.S.3d 382, 383 (App. Div. 1st Dep't 2017). A plaintiff can demonstrate compliance with Section 1304 by "proof of the actual mailings, such as affidavits of mailing or domestic return receipts with attendant signatures, or proof of a standard office mailing procedure designed to ensure that items are properly addressed and mailed, sworn to by someone

8

with personal knowledge of the procedure." CIT Bank, N.A. v. Schiffman, 948 F.3d 529, 533 (2d Cir. 2020) (hereinafter Schiffman I) (quoting Citibank, N.A. v. Conti-Scheurer, 98 N.Y.S.3d 273, 277 (App. Div. 2d Dep't 2019)). "Evidence of an established and regularly followed office procedure may give rise to a rebuttable presumption that such a notification was mailed to and received by [the intended recipient]." CIT Bank N.A. v. Schiffman, 168 N.E.3d 1138, 1142 (N.Y. 2021) (hereinafter Schiffman II) (alteration in original) (citations and quotations omitted). The proof of an office procedure "need not be supplied by the employee charged with mailing the document" but can be established by an affidavit or testimony from "an employee with personal knowledge of the practices utilized by the [company] at the time of the alleged mailing." Id.

    1. CIT Bank's 90-Day Notice

At trial, CIT Bank satisfied its burden, pursuant to Schiffman II, to establish the presumption that the Section 1304 notice (i.e., the 90-Day Notice) was properly mailed to Neris. Schulte identified Exhibits 10 and 11 as the 90-Day Notice sent to Neris, and that these Exhibits indicated on their face that they were mailed by certified and first-class mail respectively. (See Tr. at 32:20-33:17, 38:15-41:12; CIT Exs. 10-11.) Exhibit 14 evidences a record of letters that

9

CIT Bank mailed to Neris, and Schulte testified that the 90-Day Notice was listed on Exhibit 14 as mailed to Neris at the Property on September 26, 2017, by certified and first-class mail. (See id. at 47:17-53:9; CIT Ex. 14.) Schulte stated that the 90-Day Notice would not have been recorded in Exhibit 14 if it was not mailed to Neris. (See Tr. at 51:11-16, 53:3-9.)

Schulte and Nichols also explained the specific procedures CIT Bank used to mail the 90-Day Notice. Schulte stated that CIT Bank used an electronic portal to share relevant loan information with Covius, which would generate the letter and mail it on behalf of CIT Bank. (See id. at 47:22-25.) In December 2021, Nichols received a training on Covius's procedures, which have remained consistent since approximately 2011. (See id. at 102:5-13.) Nichols further explained Covius's procedures: (1) a loan servicer sends Covius an encrypted transmission of the relevant loan information; (2) Covius then incorporates the relevant loan information into a template notice that is preapproved by the loan servicer; (3) the letter is then printed, placed into an envelope, and then dropped in a bin to be mailed. (See id. at 105:7-106:2.)

Once any notices are mailed, Covius sends the servicer scans of the printed notices, which are then uploaded into a

tracking system. (See id. at 106:3-106:9; CIT Ex. 14.) Nichols further testified that the 90-Day and 30-Day Notices to Neris, which were sent by both certified and first-class mail, would have been sent in four separate envelopes. (See id. at 106:14-106:18.) Even though Schulte and Nichols were not directly "charged with mailing the document," their testimony establishes that they had "personal knowledge of the practices utilized by [CIT Bank and Covius] at the time of the alleged mailing." Schiffman II, 168 N.E.3d at 1142. Therefore, the Court finds that CIT Bank satisfied its burden, under Schiffman II, to establish the presumption that the Section 1304 notices were properly mailed to Neris.

2. The "Separate Envelope" Rule

Nonetheless, Neris argues that this case should be dismissed because CIT Bank has failed to comply with the separate envelope rule in Section 1304(2) since the 90-Day Notice contained statements about debt collection and bankruptcy. (See Neris Letter.) Neris relies on the Second Department's decision in Bank of Am., N.A. v. Kessler, 160 N.Y.S.3d 277 (App. Div. 2d Dep't 2021), that strictly interpreted the separate envelope rule. In Kessler, the plaintiff sent a Section 1304 notice to the defendant that included the Mandated Language in Section 1304(1) as well as information pertaining to the rights of debtors in bankruptcy

11

or serving in the military. See id. at 284. The Kessler court articulated a "bright-line rule that compliance with the 'separate envelope' requirement of RPAPL 1304 mandates that no material other than the notices specifically described in RPAPL 1304 be contained in that envelope." Id. at 282. This bright-line rule means that including any material, other than the Mandated Language in Section 1304(1), "constitutes a violation of the separate envelope requirement." Id. at 280. The Second Department has reiterated this bright-line interpretation of the separate envelope rule in several subsequent cases. See, e.g., Deutsche Bank Nat'l Tr. Co. v. Salva, 160 N.Y.S.3d 645, 646 (App. Div. 2d Dep't 2022); U.S. Bank N.A. v. Hinds, 165 N.Y.S.3d 127 (App. Div. 2d Dep't 2022).

Relying on this Second Department case law, Neris argues that the following two statements in the 90-Day Notice violate the separate envelope rule: (1) "This is a communication from a debt collector attempting to collect a debt. Any information obtained will be used for that purpose"; and (2) "However, if you have filed a bankruptcy petition and there is either an 'automatic stay' in effect in your bankruptcy case, or your debt has been discharged pursuant to the bankruptcy laws of

the United States, this communication is intended solely for informational purposes." (CIT Ex. 10 at 4, 11 at 4.)[3]

Federal courts in New York are bound "by the law of New York as interpreted by the New York Court of Appeals" and "the language of the state intermediate appellate courts [is a] helpful indicator[] of how the state's highest court would rule." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 48 (2d Cir. 2013) (quoting Dibella v. Hopkins, 403 F.3d 102, 112 (2d Cir. 2005)). Although federal courts in New York are not bound to follow intermediate appellate court decisions, a federal court should not disregard those decisions "unless [there is] persuasive evidence that the New York Court of Appeals, which has not ruled on th[e] issue, would reach a different conclusion." AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 139 n.15 (2d Cir. 2018).

After reviewing Section 1304, and the obligations imposed by the federal Fair Debt Collection Practices Act ("FDCPA"), the Court concludes that the New York Court of Appeals would not follow the bright-line rule that the Second Department adopted in Kessler. In reaching its decision, the Kessler court reasoned that Section 1304 did not prohibit "a lender from mailing, in other envelopes, notices to a borrower

---

[3] The 30-Day Notice contained the same language. (See CIT Exs. 12 at 4, 13 at 4.)

— whether such notices be federally mandated or consist of any other notice or information that may assist a homeowner to avoid foreclosure." Kessler, 160 N.Y.S.3d at 283. But in reaching this conclusion, the Kessler court did not grapple with how the separate envelope rule conflicts with a debt collector's obligations under the FDCPA. In particular, Section 1692e(11) of the FDCPA requires that an "initial written communication with the consumer," and any "subsequent communications," must state that the "debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11).[4] In a mortgage foreclosure, to comply with the bright-line rule announced in Kessler, debt collectors would have to omit from their "initial" and "subsequent communications" (i.e., all communications) to a borrower that the debt collector is attempting to collect a debt. However, this requirement would simultaneously violate the FDCPA. Compare Kessler, 160 N.Y.S.3d at 280, with 15 U.S.C. § 1692e(11). Put differently, debt collectors cannot simply mail a separate letter containing the FDCPA disclosure statement, as the Kessler court reasons, because the FDCPA requires the disclosure

---

4   The Second Circuit has found that a "mortgage foreclosure meets the FDCPA's broad definition of 'debt collection.'" Cohen v. Rosicki, Rosicki, & Assocs., P.C., 897 F.3d 75, 83 (2d Cir. 2018).

14

statement to be in a debt collector's "initial" and "subsequent" communications. See 15 U.S.C. § 1692e(11).[5]

In light of the conflict between the bright-line rule in Kessler and the obligations imposed by the FDCPA, the Court concludes that, in connection with the separate envelope rule, the New York Court of Appeals would reach a different conclusion than the Kessler court. On this basis, the Court concludes that it is not bound to follow Kessler. Given that the 90-Day Notice contained the Mandated Language required by Section 1304, and because CIT Bank established the presumption that the 90-Day Notice was properly mailed, the Court finds that CIT Bank complied with Section 1304 and satisfied the condition precedent to bring this mortgage foreclosure action.

### III.   ORDER

For the reasons stated above, it is hereby

**ORDERED** as follows:

- Plaintiff CIT Bank, N.A. ("CIT Bank") is entitled to judgment in foreclosure for amounts due and owing under the Note, Mortgage, and Loan Modification Agreement at issue in this action relating to the property at 64 Clinton Place, Bronx, New York 10453 ("Property"), which shall be sold to satisfy the

---

[5] It is worth noting that the FDCPA expressly preempts any state law to the extent that the state law conflicts with the FDCPA's requirements. See 15 U.S.C. § 1692n (stating that the FDCPA "does not annul, alter, or affect . . . the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of [the FDCPA], and then only to the extent of the inconsistency").

outstanding debt of defendant Ramon Neris ("Neris") to CIT Bank regarding the Property;

- The Clerk of Court is directed to enter judgment in favor of CIT Bank in the following amounts to be paid from the sale of the Property, with any unpaid amounts to be due and owing from Neris:

    - Unpaid principal in the amount: $613,452.36;

    - Interest in the amount from May 1, 2017 through February 28, 2022, at 3% per annum: $62,042.85;

    - Unpaid escrow advances in the amount of: $38,452.64; and

    - Additional interest in the amount of $35.24 per day from February 29, 2022, through the date of entry of judgment; and it is further

**ORDERED** that CIT Bank shall file all of its trial exhibits on the public docket within ten days;

**ORDERED** that the Clerk of Court shall terminate all pending motions and close the case.

**SO ORDERED.**

Dated:    June 2, 2022
          New York, New York

_____
Victor Marrero
U.S.D.J.