M2sncitf

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CIT BANK N.A.,

4                  Plaintiff,

5           v.                          18 Civ. 1511 (VM)

6   RAMON NERIS, *et al.*,

7                  Defendants.
                                        Trial
8   ------------------------------x
                                        New York, N.Y.
9                                       February 28, 2022
                                        9:00 a.m.
10
    Before:
11
                        HON. VICTOR MARRERO,
12
                                        District Judge
13

14                  APPEARANCES (Via Zoom)

15  GROSS POLOWY
         Attorneys for Plaintiff
16  BY:  MARIE NICHOLSON
         STEVEN VARGAS
17
18  GOMBERG LEGAL PC
         Attorneys for Defendants
19  BY:  STANISLAV GOMBERG

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2sncitf

1              THE COURT:  This is a proceeding in the matter of CIT

2      Bank v. Neris.  It is Docket No. 18 Civ. 1511, and it is the

3      trial of this matter before this Court.

4              We are holding a bench trial on the underlying

5      dispute, which involves a mortgage loan made by plaintiff CIT

6      Bank to defendant Ramon Neris in 2007 and subsequently modified

7      in 2016.  The bank alleges that the loan has not been paid, it

8      is in default, and that the bank sent notice to the plaintiff

9      of that default and it has not resulted in payment.

10             The defendant Mr. Neris alleges that the notice of

11     default that the bank sent was defective.

12             Ms. Nicholson, is the plaintiff ready to proceed?

13             MS. NICHOLSON:  Yes, your Honor.

14             THE COURT:  All right.

15             Mr. Gomberg, is the defendant ready to proceed?

16             MR. GOMBERG:  Your Honor, we have actually an

17     application prior to proceeding with the trial.  Based on new

18     case law that was decided in late December and progeny from the

19     Second Department Appellate Division showing that the 90-day

20     notice requires certain specific notices to be included within

21     it and any additional notices included within that that are not

22     in a separate envelope make the 90-day notice defective on its

23     face by disallowing any attempt to having a *prima facie* case

24     made by the plaintiff.

25             Accordingly, defendants are moving to dismiss.

M2sncitf

1    Obviously if an oral application will not be entertained, we

2    request a briefing schedule to your Honor's convenience in

3    order to brief the matter for your Honor, but it is a condition

4    precedent for a foreclosure matter.  And the new case law and

5    its progeny are quite clear as to the requirements for a 90-day

6    notice, and it will lead to dismissal of this case.  Thereby,

7    an application before the trial starts seems to be appropriate.

8              THE COURT:  Mr. Gomberg, a question.

9              You stress that this is new case law.  So, presumably

10   if the case law was not in effect at the time the bank made the

11   loan or at the time that this matter was filed by the plaintiff

12   in this Court, is there any indication that this new case law

13   was retroactive to the time that this matter commenced?

14             MR. GOMBERG:  Yes, your Honor.  Because the case law

15   is actually an interpretation of 1304 of the Real Properties

16   Action Procedure Law that provides the condition precedent

17   requirement of the 90-day notice, and this was a reading of the

18   exact statute showing that the notice requirement that is

19   included in RPAPL 1304(2) specifies notice.  And as notice is

20   specified, the statutory interpretation of it is that there

21   must be a separate notice, if any other notices are to be

22   provided.  Included in a separate envelope.

23             In our case the 90-day notice obviously includes

24   notices for bankruptcy and debt collection on the same page,

25   let alone the same envelope, as the 90-day notice, thereby

M2sncitf

1   making a *prima facie* case impossible in this case based on

2   ineffective notice.

3           THE COURT:  Mr. Gomberg, the case law you referred to

4   is in the Second Department.  Is there any indication that that

5   interpretation applies as well or has been interpreted as well

6   by any court in the First Department?

7           MR. GOMBERG:  There has not been a case yet in the

8   First Department or the Third Department or any other

9   department, other than the Second Department having a number of

10  cases noting this.  But once again, as noted, it is not an

11  additional construct.  It is just an interpretation that for

12  the first time an argument was actually heard by any appellate

13  court, and thus the Second Department was the first to render

14  the decision.

15          The decision seems to be clearly broad in scope as

16  regarding to the rest of the state, and it deals with the

17  statute that is the condition precedent.

18          THE COURT:  Mr. Gomberg, any indication of how many

19  loans potentially might be put in question by this ruling?

20          MR. GOMBERG:  A lot.  A lot, your Honor.  A lot.  A

21  lot.  I do not do foreclosure on plaintiffs' side, and again

22  any sort of anecdotal evidence that I have of other plaintiffs'

23  attorneys who have, you know, spoken to me about this, the

24  difficulties in having many cases being dismissed because there

25  is not adequate notice, the statutory interpretation by the

M2sncitf

Second Department -- it's quite vast and broad in scope and

likely affects many of the case that is plaintiffs' counsel --

undoubtedly affects many of the case that is plaintiffs'

counsel has currently pending and awaiting pending on its

docket.

THE COURT:  Under those circumstances, Mr. Gomberg,

what is the wisdom of this Court dismissing this action at this

point when there is considerable uncertainty as to what the

First Department might do or let alone the Court of Appeals?

Is this not an issue that should be decisively

resolved by the state court before this court dismisses the

complaint?

MR. GOMBERG:  We would -- obviously, your Honor, we

would disagree with that as seemingly the interpretation of,

for the first time, on the notice requirement for the 90-day

notice seems to be quite clear as discussed and interpreted by

the Second Department.  There is no Court of Appeals case

currently pending based on that Second Department appeal

decision to my knowledge.

THE COURT:  Was that Second Department case or cases

appealed to the Court of Appeals?

MR. GOMBERG:  I believe not.  I cannot say for

certain.  But from what I have seen on my research account,

none of them have currently been appealed to the Court of

Appeals, let alone accepted for certiorari.

M2sncitf

1          THE COURT:  Mr. Gomberg, let's assume for the moment

2     that the Court were to dismiss this action and tomorrow the

3     bank then sent a notice in accordance with the Second

4     Department ruling in a separate envelope.  What have we gained?

5          In other words, in that event, what would happen is

6     that there would be a new order pursuant to the state law and

7     the clock would start running again, and in 90 days presumably

8     if the defendant has not cured the default we're right back

9     here.

10          What is there is to be gained under those

11     circumstances?

12          MR. GOMBERG:  Your Honor, for my client to regain his,

13     the ability to increase his income in a certain amount of time

14     in order to be able to submit another application.

15          As to the Court, it's clear that, you know, in to

16     maintain a *prima facie* case, plaintiff has their requirements,

17     and if they can't maintain their requirements they can't go

18     forward with the foreclosure judgment.

19          But as to the defendant, it does provide an

20     opportunity.  My client has maintained that he wants to keep

21     the property.  He wants to get back on --

22          THE COURT:  Mr. Gomberg, as you know from the

23     settlement discussions as of the last conference we had a few

24     days ago, the defendant has had since 2016 opportunities to

25     cure the default or to indicate in good faith that he is

M2sncitf

1    prepared to honor the mortgage.  What is there to indicate that

2    if this matter were to be dismissed today and the bank were to

3    refile tomorrow that anything will happen in the next 90 days?

4          MR. GOMBERG:  I wouldn't say -- look, I don't have an

5    indication that something would happen in the next 90 days.  My

6    indication is I am confident some sort of a deal can be worked

7    out in the amount of time it would take for this matter to be

8    filed again.

9          Again, I can only go by what my client tells me.  My

10   client doesn't want to keep the house, and he does want to make

11   the payments on the house.  Clearly his financials do not

12   demonstrate ability to do so currently.  But that doesn't

13   discount the possibility may have to increase his income with

14   some sort of substantial change in circumstances to allow him

15   to submit an application or to be heard by the bank or even

16   for --

17         THE COURT:  Let me come back.

18         Procedurally, total dismissal and forcing the

19   plaintiff to start from scratch may not be the most efficient

20   way to proceed in this case.  If I were to accept your theory

21   that the Second Department ruling applies, the Court will

22   dismiss the matter without prejudice so that the plaintiff

23   would not have to start with a new complaint and start the

24   entire process all over and serve the defendant.  If it's

25   without prejudice, as soon as they are in compliance with the

M2sncitf

1    notice schedule, we will be right back here and that

2    theoretically could happen in a few days, again theoretically.

3              MR. GOMBERG:  If that were the case, then that would

4    be the case, your Honor.  Again, you know, plaintiff can't

5    maintain its *prima facie* case as we've stated.  Clearly

6    defendant has his hopes and his anticipations for making a

7    future deal that doesn't, you know, weigh on this court in a

8    substantial manner.  I understand that.

9              But one way or another, plaintiff's case can't proceed

10   as they can't make their case here.  Whatever the Court decides

11   to do, obviously there are -- there is a savings statute that

12   allows for the plaintiff to have six months after dismissal of

13   the case, which I imagine they will not dismiss their case on

14   their own based on the defect because of that savings statute

15   being in effect, only based on a dismissal.

16             But notwithstanding, whatever it does take for the

17   plaintiff to get their foreclosure ship righted with the

18   correct documents is what they will do, and defendant will hope

19   that a substantial change will take place so that he can submit

20   an application that the plaintiff can accept and review and

21   hopefully get to a modification of the mortgage.

22             THE COURT:  Thank you.

23             Let me turn the matter over to the plaintiff's

24   attorney for comment.

25             Ms. Nicholson.

M2sncitf

1          MS. NICHOLSON:  Your Honor, the case law that counsel

2     is referring to is the *Kessler* case, and I am very familiar

3     with it.  It was decided by the Second Department.  There has

4     been other case law that has come down that is of similar

5     opinion within the Second Department.

6          It is our position that those decisions are going to

7     be appealed.  They have not yet been brought up by the Court of

8     Appeals.  However, that is the intention of plaintiffs'

9     attorneys in those cases is to appeal those decisions on the

10    grounds that the notices -- and I use that term loosely -- the

11    FDCPA warning and the bankruptcy warning that are included in

12    the 90-day notices that are referenced in *Kessler*, the FDCPA

13    requires the debt collection language.  And the bankruptcy

14    language is so that we do not violate the bankruptcy law, which

15    states that we cannot collect a debt if the debtor has filed a

16    bankruptcy case.  And we are not always noticed when a debtor

17    files a bankruptcy case.  And therefore that's why those

18    provisions are within the notices.  And it is our belief that

19    the Court of Appeals will overturn the *Kessler* decision as well

20    as the other decisions that have emanated therefrom.

21          I don't believe that the Second Department Appellate

22    Division case law is controlling in this case, and I would ask

23    that the trial be permitted to move forward.

24          And I would also point out that counsel did not bring

25    a -- did not file a pretrial memo, did not raise this issue

M2sncitf

1    earlier.  The case law has been available since December.

2              I don't believe that counsel's client is here today.

3    He is supposed to be available for testimony.  And if he is not

4    here I would move that the answer be stricken, and I would move

5    for a directed verdict, your Honor.

6              THE COURT:  Right.  Thank you.

7              Mr. Gomberg, Ms. Nicholson has pointed out that your

8    client is not available.  You may recall that this issue came

9    up at the last pretrial conference, where the plaintiff

10   indicated that it wanted to have Mr. Neris available for

11   questioning at the trial.

12             What is your explanation for your client, who brought

13   this action, not being here and available to testify in person?

14             MR. GOMBERG:  I actually did speak to my client since

15   going to visit the note at plaintiff's office, where I said I

16   wasn't able to get in contact with my client.  Since then I

17   have been able to speak with him, and I can text him and get

18   him on the Zoom call, if need be.  But I would state that even

19   a directed verdict is not possible where a *prima facie* case

20   cannot be made, and I --

21             THE COURT:  Mr. Gomberg, I'm sorry.  You're skipping

22   over a point.  You said if need be.  It is need, here.  I

23   indicated to you at the last conference that the plaintiff had

24   the right to have Mr. Neris available for questioning at trial.

25   Your client brought this action, and for him not to be

M2sncitf

1    available for questioning at the official trial of the matter I

2    think is very critical.

3        MR. GOMBERG:  Well, my client didn't bring the case.

4    Obviously it's a foreclosure against my client.  I just texted

5    my client to get onto the Zoom link right now, and hopefully we

6    will see him in a moment.

7        But the reason he is not on the Zoom link right now is

8    because of the issue I brought up prior to the trial starting,

9    the application.  I figured that I might as well hear the

10   decision of your Honor, especially if this issue is to be

11   briefed, then my client wouldn't have had to come on now.

12   Again, I just texted him, so hopefully we see his name pop up

13   within the Zoom screen within a moment.

14       THE COURT:  Thank you.  Apologies for my reference to

15   plaintiff having brought the action -- I'm sorry, Mr. Neris

16   bringing the action.  You're quite correct.  Mr. Neris is the

17   defendant and is presenting a defense under the statute.

18       All right.  I am not going to dismiss this complaint

19   at this point on this record.  And I will allow the defendant,

20   the bank to submit a letter not to exceed three pages

21   responding to your motion, which I deem to be a motion to

22   dismiss the complaint on the basis of the statutory

23   interpretation of the Second Department.

24       Ms. Nicholson, how long would it take you to submit

25   such a three-page letter?

M2sncitf

1          MS. NICHOLSON:  Within a week, your Honor.

2          THE COURT:  All right.  Thank you.

3          Mr. Gomberg, I will similarly give you an opportunity

4     to respond to that submission within a week of the filing.  In

5     the meantime I am ready to proceed with the trial.

6          Ms. Nicholson, do you want to proceed at this point?

7          MS. NICHOLSON:  Yes, your Honor.

8          THE COURT:  I have received the plaintiff's exhibit

9     binders that were submitted to the Court in hard copy, both the

10    unredacted exhibits as well as the redacted exhibits, and I

11    have had an opportunity to review those documents.  So I am

12    familiar also with the history of this litigation, which is now

13    going into its fourth year.

14          So let us not unnecessarily repeat anything that has

15    already been argued or said and go straight into the trial

16    testimony.

17          All right.  Ms. Nicholson.

18          MS. NICHOLSON:  I would like to call Ramon Neris.

19          I do not believe that he has joined the trial.

20          THE COURT:  Mr. Gomberg, I will give you an

21    opportunity to get Mr. Neris on the line.

22          MR. GOMBERG:  I am texting him right now to join.  I

23    imagine, you know, beforehand, while he gets on the line, if

24    that is a possibility, like I said -- he just texted me back, I

25    understand.  He should be on the line shortly.  He's asking me

M2sncitf                          Shulte – Direct

1    to resend it.

2              MS. NICHOLSON:  Your Honor, I have two other witnesses

3    in the waiting room.  I can start with Ms. Shulte since

4    Mr. Neris is not here.  I am going to admit her into the

5    meeting now.

6              THE COURT:  All right.  Proceed.

7              MS. NICHOLSON:  Good morning, Ms. Shulte, can you hear

8    us?

9              THE WITNESS:  Yes, I can.

10             MS. NICHOLSON:  At this time, Ms. Shulte, will give

11   her testimony first, your Honor.  I don't know if the swearing

12   in --

13             THE COURT:  All right.  Ms. Shulte, would you identify

14   yourself.  And then Ms. Nicholson you may proceed with the

15   direct examination.

16             THE WITNESS:  My name is Stephanie Shulte.

17   STEPHANIE SHULTE,

18        called as a witness by the Plaintiff,

19        testified as follows:

20   DIRECT EXAMINATION

21   BY MS. NICHOLSON:

22   Q.  Good morning, Ms. Shulte.

23             Are you presently employed?

24   A.  Yes.

25   Q.  By whom are you employed?

M2sncitf                         Shulte - Direct

1   A.   CIT Bank.

2   Q.   And how long have you been employed by CIT Bank?

3   A.   13 years.

4   Q.   What is your current title with CIT Bank?

5   A.   Associate.

6   Q.   As an associate, what are your daily duties and

7   responsibilities?

8   A.   My responsibilities include oversight of the subservicer.

9   That includes policies and procedures as they pertain to -- of

10  the subservicer -- sorry.  Document review.  I am a notary.  I

11  manage the purchase order management and approval of invoices

12  for vendors.

13  Q.   How long have you been working with CIT?

14  A.   13 years.

15  Q.   Have you received training with CIT?

16  A.   Yes.

17  Q.   What did that training consist of?

18  A.   I'm trained in all the different systems that -- for the

19  loan servicing.  We have three different systems that we use.

20  One of them is MIK, which is the mortgage information

21  knowledge.  That covers all of the loan documents and

22  information on the loan.  WebXtender imaging system, where it

23  hold all the images for the documents.  And also our mortgage

24  servicing oversight share point site that also includes many of

25  the documents.

M2sncitf                      Shulte - Direct

1    Q.  Can you retroactively change anything within CIT systems?

2    A.  No.

3    Q.  And can you retroactively add anything to CIT systems?

4    A.  No.

5    Q.  And can you delete any records or notes within the system?

6    A.  No.

7    Q.  With any of the three systems that you mentioned?

8    A.  No.

9    Q.  Do you rely upon those systems to gather facts and

10   knowledge about the loans, and did you do so in this case?

11   A.  Yes.

12   Q.  Okay.  And I am going to share my screen now --

13   A.  Okay.

14   Q.  -- so you that can see.

15          Can you see what has been marked for identification

16   purposes as Plaintiff's 1?

17   A.  Yes.

18   Q.  Okay.  Can you identify this document?

19   A.  Just by the title of it or you -- I don't see the actual

20   document.

21   Q.  You don't see it your screen?

22   A.  No, I don't see the document.  I see a list of documents,

23   but not the actual document.

24   Q.  Okay.  Let's try again.  Can you see the document now?

25   A.  No.

M2sncitf                         Shulte - Direct

1   Q.  Can you see it now?

2   A.  Yes.

3   Q.  Okay.  Do you recognize this -- can you identify this

4   document?

5   A.  Yes, it's the note.

6   Q.  Okay.  And is this document created in the ordinary course

7   of CIT's business?

8   A.  Yes.

9   Q.  Is it maintained in the ordinary course of CIT's business?

10  A.  Yes.

11          MR. GOMBERG:  Objection.

12          MS. NICHOLSON:  I would like to enter this into

13  evidence as a certified original note.

14          MR. GOMBERG:  Objection.  Am I not being heard?

15          I objected to the admission of -- first of all, the

16  note -- of the question.  There's been no basis to establish

17  that she -- that the witness has the -- has any knowledge of

18  these records, personal knowledge of these records herself in

19  order to be able to be able to establish that this is the note

20  in this case.

21          MS. NICHOLSON:  Your Honor, you're muted.

22          MR. GOMBERG:  I'm muted?

23          MS. NICHOLSON:  Your Honor --

24          THE COURT:  Mr. Gomberg, this is a bench trial, and I

25  think it would behoove the parties to move matters along

1   without undue procedural disputes.  This document is what it is

2   on its face.  The witness has been identified as an official

3   familiar with the recordkeeping of the bank, and I just don't

4   see that there is any good-faith basis for objecting to this

5   document.

6          MR. GOMBERG:  So is the objection going to be

7   overruled, your Honor?

8          THE COURT:  The objection is overruled.

9          MS. NICHOLSON:  I would move to admit the

10  attorney-certified original note into evidence.  This office

11  attests that we are in possession of the original note in our

12  vault.  Opposing counsel Stanislav Gomberg did review that

13  original note in our vault.

14         THE COURT:  All right.  Objection overruled.

15         The document is admitted.

16         (Plaintiff's Exhibit 1 received in evidence)

17         THE COURT:  Mr. Gomberg's objections are noted.

18         Proceed.

19         MR. GOMBERG:  Your Honor, can we see the last page,

20  the last couple of pages.  Can we see the full note at least.

21         MS. NICHOLSON:  Yes.

22         MR. GOMBERG:  This is not the same note that was filed

23  with the complaint, your Honor.  The last page of the actual

24  mortgage note has a cross-out of the signature.  It's the

25  fourth to last page, I believe it is page 5.  There.  There is

1    a cross-out saying void, which is not -- did not accompany the

2    complaint that was attached -- the note that was attached to

3    the complaint.

4              MS. NICHOLSON:  That is accurate, your Honor.

5              Through testimony we will establish that CIT did add

6    additional allonges and adjusted the endorsement upon an

7    attempt to sell the loan in January of 2020, which was after

8    the action was commenced.  So the note that was filed with the

9    summons and complaint is how the note looked at that point in

10   time.  It has, since the commencement of this action, changed.

11             THE COURT:  Thank you.

12             Proceed.

13             MS. NICHOLSON:  Thank you.

14   BY MS. NICHOLSON:

15   Q.  Ms. Shulte, can you advise what this document is.

16   A.  This is the note to the mortgage.

17   Q.  How much was lent?

18   A.  $451,250.

19   Q.  And what was the date of the note?

20   A.  August 15, 2007.

21   Q.  How can you identify that this is the note that relates to

22   this foreclosure action, this loan?

23   A.  The loan number at the top.

24   Q.  Is there any other identifying information?

25   A.  The borrower name and the property address.

M2sncitf                          Shulte – Direct

1   Q.  And what is the property address?

2   A.  64 Clinton Place, Bronx, New York 10453.

3   Q.  And is there a signature on this document?

4   A.  Yes, there is.

5   Q.  And whose signature is that?

6   A.  Ramon Neris.

7          MR. GOMBERG:  Objection, your Honor.

8          THE COURT:  Overruled.

9   Q.  Now, Ms. Shulte, when did CIT gain possession of the note?

10  Was it prior to commencement of this action?

11  A.  Yes.

12  Q.  And at that point in time, did the endorsements and

13  allonges look how they look today?

14  A.  No.

15  Q.  Why is that?

16  A.  Due to the loan sale earlier in 2019, 2020, there was a

17  change in the note in the allonge.

18  Q.  Who made that change?

19  A.  Treasury in CIT Bank.

20          MS. NICHOLSON:  At this point in time I am going to

21  reduce this document and bring up the next document.

22  BY MS. NICHOLSON:

23  Q.  Can you see this document on your screen?

24  A.  Yes.

25  Q.  Okay.  Can you identify this document?

1    A.  Can you move to the second page.  There we go.  The

2    mortgage of the loan.

3              MS. NICHOLSON:  Okay.  At this point in time I would

4    like to move what has been marked as Plaintiff's Exhibit 2 into

5    evidence as a certified copy of the mortgage.  The

6    certification from the county clerk is the first page.

7              MR. GOMBERG:  Note my objection.

8              MS. NICHOLSON:  You're muted, your Honor.

9              THE COURT:  Objection overruled.

10             (Plaintiff's Exhibit 2 received in evidence)

11             THE COURT:  Proceed.

12             MS. NICHOLSON:  Thank you.

13   BY MS. NICHOLSON:

14   Q.  Ms. Shulte, what is the date of this document?

15   A.  August 15, 2007.  Can you bring it up just a little bit

16   larger.

17   Q.  I can try.

18   A.  Perfect.  Thank you.

19   Q.  And is this the mortgage that is related to the note that

20   you just -- that you just testified to?

21   A.  Yes, it is.

22   Q.  How do you know that?

23   A.  The address and the -- let me see.  The address of the

24   property, the borrower name.

25   Q.  And who is the borrower on this mortgage?

1    A.  Ramon Neris.

2    Q.  What is the address?

3    A.  64 Clinton Place, Bronx, New York 10453.

4    Q.  And is there a signature on this document?

5    A.  Yes.  Yes, there is.

6    Q.  What is the name on the signature line?

7    A.  Ramon Neris.

8              MS. NICHOLSON:  Thank you.  I am now going to minimize

9    this document and bring up the next document.

10   BY MS. NICHOLSON:

11   Q.  Can you see this document?

12   A.  Yes.

13   Q.  Ms. Shulte, can you identify this document?

14   A.  It is an assignment of mortgage.

15             MS. NICHOLSON:  Your Honor, at this point in time I

16   would like to move this, Plaintiff's 3 for identification

17   purposes, into evidence as a certified copy of the assignment

18   of mortgage.  The certification from the county is the first

19   page.

20             MR. GOMBERG:  Objection to foundation.

21             THE COURT:  Objection overruled.

22             Proceed.

23             (Plaintiff's Exhibit 3 received in evidence)

24   BY MS. NICHOLSON:

25   Q.  Ms. Shulte, what the purpose of this document?

M2sncitf                          Shulte – Direct

A.   This document is assigning the ownership of the loan from

one entity to another.  This particular one -- sorry.  It's

very small.  Can you make it a tiny bit bigger?

Q.   Yes.

A.   This is assigning the mortgage from MERS as nominee to

IndyMac Bank FSB to OneWest Bank.

Q.   What is the relationship between CIT and OneWest?

          MR. GOMBERG:  Objection.

A.   In 2015, OneWest bank changed its name due to merger to CIT

Bank.

Q.   Thank you.

          MR. GOMBERG:  Your Honor, I believe you're muted for

the response --

          THE COURT:  Objection overruled.

          MR. GOMBERG:  Thank you, your Honor.

          THE COURT:  Proceed.

BY MS. NICHOLSON:

Q.   Ms. Shulte, can you identify this document?

A.   This is a loan modification.

          MS. NICHOLSON:  Your Honor, I would like to move what

has been marked for plaintiff's identification purposes as

Exhibit 4 into evidence as a certified copy of the

modification.  The certification county register is page 1.

          MR. GOMBERG:  Objection, your Honor.  No foundation

established, what mortgage, what modification, for what case

1   this is.

2           THE COURT:  Ms. Nicholson, would you have Ms. Shulte

3   address the circumstances of this mortgage assignment.

4           MS. NICHOLSON:  The modification, your Honor?

5           THE COURT:  Yes, the modification.

6           MS. NICHOLSON:  Certainly.

7   BY MS. NICHOLSON:

8   Q.  Ms. Shulte, can you identify this document?

9   A.  Yes, this is a modification of mortgage.

10  Q.  And was this document created in the ordinary course of

11  CIT's business?

12  A.  Yes.

13  Q.  And is it in the ordinary course of CIT's business to

14  maintain this document?

15  A.  Yes.

16  Q.  Where is it maintained?

17  A.  It is in our WebXtender imaging system.

18  Q.  And is the modification created at or near the time the

19  modification is entered into?

20  A.  Yes.

21  Q.  And is the modification created by someone with firsthand

22  knowledge of the modification itself, the terms, and how

23  they'll be entered into?

24  A.  Yes.

25  Q.  And was this document created by somebody with a duty to

1    act honestly and accurately within CIT's recordkeeping system?

2    A.  Yes.

3    Q.  And is this a true and accurate copy of the electronic

4    record that is maintained by CIT?

5    A.  Yes, it is.

6    Q.  Thank you.  At this point in time I would like to move this

7    exhibit into evidence as Plaintiff's Exhibit 4.

8            MR. GOMBERG:  Same objection, your Honor.  Not

9    describing what the case -- what this modification -- what case

10   this modification is for, among other things.

11           You're muted, your Honor.

12           THE COURT:  Ms. Nicholson, again, can you indicate how

13   this modification came about.

14           MS. NICHOLSON:  Certainly.

15   BY MS. NICHOLSON:

16   Q.  Ms. Shulte, how did this modification come into play?

17   A.  The borrower, Ramon Neris, noted on the modification would

18   have applied for a modification in order to lower his mortgage

19   payment.

20           MR. GOMBERG:  Objection.

21   A.  This is the actual agreement --

22           MS. NICHOLSON:  Your Honor, this is a certified copy

23   from the clerk's office.  My client has identified it as a

24   modification entered into by CIT and Ramon Neris.  Once the

25   exhibit is entered into evidence, she can read off of it and

M2sncitf                    Shulte - Direct

1    identify it by the address, the loan number, etc.

2                 MR. GOMBERG:  Ms. Shulte -- the witness, Ms. Shulte,

3    just stated she would have -- again, she doesn't have any

4    knowledge as to what actually with happened about this

5    document, again no personal knowledge, no foundation for her

6    knowledge of the business records as well.

7                 MS. NICHOLSON:  It is a business record, your Honor.

8    It is an exception --

9                 MR. GOMBERG:  Then lay a foundation.

10                MS. NICHOLSON:  I just did.  It was maintained in the

11   ordinary course of business.  It was created in the ordinary

12   course of business.  It is created by someone with firsthand

13   knowledge of the modification.  It's entered into by someone

14   with a duty to report honestly and accurately within the

15   recordkeeping system, and it is an exact copy of the electronic

16   record as it is maintained by CIT in their imaging system, all

17   of which Ms. Shulte testified, which establishes it as a

18   business record.

19                THE COURT:  Objection overruled.

20                (Plaintiff's Exhibit 4 received in evidence)

21                THE COURT:  Proceed.

22                MS. NICHOLSON:  Thank you.

23   BY MS. NICHOLSON:

24   Q.  Ms. Shulte, can you take a look at the document.

25                Do you need me to make it bigger?  Can you read it?

M2sncitf                        Shulte - Direct

1   A.  Yes, please, make it a little bigger please.  That's good.

2   Q.  What is the date of this modification agreement?

3   A.  Can you move it over just slightly.  Sorry.  That's good.

4   That's good.  The date on the modification -- sorry.  I'm

5   trying to find it.

6   Q.  Hold on.

7   A.  There we go.  December 7, 2016.

8   Q.  Who are the parties to the modification?

9   A.  CIT Bank and Ramon Neris.

10  Q.  What is the address of the property?

11  A.  64 Clinton Place, Bronx, New York 10453.

12  Q.  How can you -- how do you know that this modification

13  applies to the loan that is the subject of this foreclosure

14  action?

15  A.  The borrower name, the property address.  There is a loan

16  number at the top as well.

17  Q.  Okay.  And what is the interest rate on this modification?

18  A.  3 percent.

19  Q.  Is that a fixed rate?

20  A.  Yes.

21  Q.  Okay.  And at what point would payments according to this

22  modification begin?

23  A.  Payment would begin January 1, 2017.

24  Q.  And are there signatures on this document?

25  A.  Yes.

M2sncitf                        Shulte – Direct

1    Q.   What are the names on those signature blocks?

2    A.   Ramon Neris as the borrower; and for CIT Bank, Samuel

3    Countess (phonetic).

4                MS. NICHOLSON:   Thank you.

5                I'm sorry.   Did someone say something?

6                I am going to pull up the next document.

7                Your Honor, this is a certified copy of the summons

8    and complaint.   The copy that is in the binder unredacted for

9    the Court is with the raised seal certified from the county

10   clerk's office.   At this point in time I would like to move

11   this into evidence as Plaintiff's Exhibit 5.

12               MR. GOMBERG:   No objection.

13               MS. NICHOLSON:   Sorry.   Did you say no objection?

14               THE COURT:   Without objection.

15               MS. NICHOLSON:   Thank you.

16               (Plaintiff's Exhibit 5 received in evidence)

17   Q.   Ms. Shulte, are you familiar with this document?

18   A.   Yes.

19   Q.   What are you familiar with it to be?

20   A.   It is the complaint from the borrower.

21   Q.   And I am going to scroll down.   Do you recognize this

22   document that is attached to the complaint?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's the note to the mortgage.

M2sncitf                         Shulte - Direct

1    Q.  And is this the same note that you testified to as

2    Plaintiff's Exhibit 1?

3    A.  Yes.

4    Q.  Are there any differences?

5           MR. GOMBERG:  Your Honor, can you please make a -- my

6    objection.

7           MS. NICHOLSON:  I'm sorry.  I couldn't hear you.

8           MR. GOMBERG:  Your Honor is muted.

9           THE COURT:  I am not muted.  What is your objection

10   again?

11          MR. GOMBERG:  The objection is that she has no basis

12   to testify, as to compare this note with the prior note,

13   because she has not -- the foundation for her being called as

14   having business -- having personal knowledge as to these

15   records.

16          THE COURT:  Overruled.

17   BY MS. NICHOLSON:

18   Q.  What are the differences between this note and Plaintiff's

19   Exhibit 1?

20   A.  If you scroll to here, the endorsement on this one has not

21   been crossed out.

22   Q.  What about the allonges?

23   A.  The allonges, the first allonge here I believe is the same.

24   The second allonge here is endorsed from OneWest Bank to blank,

25   whereas the first one that we looked at was actually endorsed

M2sncitf                        Shulte - Direct

1  to CIT bank I believe.

2  Q.  Okay.  And was there another allonge on that first note?

3  A.  The first note had an additional allonge that went from CIT

4  Bank to blank.

5  Q.  When CIT came into possession of the original note, did it

6  look like this note that is attached to the complaint?

7  A.  Yes.

8  Q.  And --

9          MR. GOMBERG:  Your Honor, if I may -- your Honor.

10          MS. NICHOLSON:  We couldn't hear you, Mr. Gomberg.

11          THE COURT:  Did you say something?

12          MR. GOMBERG:  I objected.  If your Honor could make a

13  ruling on that.

14          THE COURT:  Objection overruled.

15          MR. GOMBERG:  Thank you, your Honor.

16  BY MS. NICHOLSON:

17  Q.  When this complaint was filed, in 2018, was CIT in physical

18  possession of the physical note?

19  A.  Yes.  CIT's treasury -- I'm sorry.  Deutsche Bank is our

20  custodian, and the custodian would have had the note at the

21  time of the complaint.

22  Q.  Okay.  Did it resemble this note?

23  A.  Yes.

24          MS. NICHOLSON:  This is Plaintiff's 6.  It is a

25  certified copy of the summons and complaint -- not the

1   complaint.  I apologize.  The summons.  I would like to admit

2   it into evidence as Plaintiff's 6.  It is just a copy of the

3   summons.

4              MR. GOMBERG:  No objection, your Honor.

5              THE COURT:  Admitted without objection.

6              Proceed.

7              (Plaintiff's Exhibit 6 received in evidence)

8              MS. NICHOLSON:  The next document is a certified copy

9   of the lis pendens from the commencement of the action in 2018.

10  It is marked for identification purposes as Plaintiff's Exhibit

11  7.  I would like to admit it into evidence as proof that notice

12  has been filed.  It is a certified copy from the clerk's

13  office.

14             MR. GOMBERG:  No objection, your Honor.

15             THE COURT:  Admitted without objection.

16             (Plaintiff's Exhibit 7 received in evidence)

17             MS. NICHOLSON:  What is marked for identification

18  purposes as Plaintiff's Exhibit 8 is the certified copy of the

19  lis pendens, that is, the current lis pendens that was filed in

20  2021.  I would like to admit this into evidence as a certified

21  copy from the county clerk's office for the purpose of showing

22  that the lis pendens is current.

23             MR. GOMBERG:  Also no objection, your Honor.

24             THE COURT:  Admitted without objection.

25             (Plaintiff's Exhibit 8 received in evidence)

M2sncitf                        Shulte - Direct

1              MS. NICHOLSON:  Thank you.

2    BY MS. NICHOLSON:

3    Q.   Ms. Shulte, can you identify this document?

4    A.   Can you make it a little smaller.  Sorry.

5    Q.   Sure.

6    A.   Can I see the first page of it.  Okay.  Yes.  That is the

7    90-day notice.

8    Q.   Is this notice created in the ordinary course of CIT's

9    business?

10   A.   Yes.

11   Q.   And is this document maintained within CIT's recordkeeping

12   system?

13   A.   Yes.

14   Q.   Where is it maintained?

15   A.   The WebXtender imaging.

16   Q.   Okay.  And was this notice created at or near the time of

17   the mailing?

18   A.   Yes.

19   Q.   And is the information in this notice created by someone

20   with firsthand knowledge of the event or transaction or the

21   information it depicts?

22   A.   Yes.

23   Q.   And is this notice created by somebody within CIT's

24   recordkeeping system with a duty to report honestly and

25   accurately within that system?

M2sncitf                        Shulte – Direct

1    A.  Yes.

2    Q.  Is this a true and accurate copy of the electronic record

3    as it is maintained?

4         Let me just scroll down so you can see the full

5    document before you answer that question.

6    A.  Yes, it is.

7         MS. NICHOLSON:  Thank you.

8         At this point in time I would like to move what has

9    been marked as Plaintiff's Exhibit 10 for identification

10   purposes into evidence.

11        MR. GOMBERG:  Your Honor, objection.  Can we at least

12   have the witness state what 90-day notice this is, what case.

13        MS. NICHOLSON:  Your Honor, the witness has identified

14   the document as a business record of CIT.

15        THE COURT:  Overruled.

16        (Plaintiff's Exhibit 10 received in evidence)

17        THE COURT:  Proceed.

18        MS. NICHOLSON:  Thank you.

19   BY MS. NICHOLSON:

20   Q.  Ms. Shulte, can you identify for the Court how you know

21   that this notice pertains to this loan?

22   A.  The borrower name and address is on this first address

23   page.

24   Q.  Is there any other identifying information?

25   A.  On this page it shows the loan number and then the borrower

1    name and address as well, and property address.

2    Q.  And what is the borrower's name and address?

3    A.  The borrower's name is Ramon Neris.  The address is 64

4    Clinton Place, Bronx, New York 10453-1422.

5    Q.  What is the purpose of this notice?

6    A.  This notice is mandated by the State of New York to be sent

7    to the borrower within 90 days of the commencement of

8    foreclosure.

9    Q.  How was this notice mailed?

10   A.  This particular document was mailed certifying --

11            MR. GOMBERG:  Your Honor, objection.

12            She's made no -- she has no personal knowledge of

13   this, has not testified to any personal knowledge of the

14   mailing practices and procedures in order to be able to testify

15   to matters concerning mailing.

16            MS. NICHOLSON:  Your Honor, the document speaks for

17   itself on its face.  It says sent via certified mail.

18            THE COURT:  Overruled.

19            MS. NICHOLSON:  Thank you.

20   BY MS. NICHOLSON:

21   Q.  Ms. Shulte, I am now going to show you another exhibit.  I

22   apologize.

23            MS. NICHOLSON:  This is a little bit out of order.  I

24   missed this document previously.

25   BY MS. NICHOLSON:

M2sncitf                      Shulte - Direct

1    Q.  Ms. Shulte, can you identify this document?

2    A.  Yes.  That is a screen shot of our WebXtender imaging

3    system.

4    Q.  And is this screen shot created in the ordinary course of

5    CIT's business?

6    A.  Yes.

7    Q.  And is this screen shot maintained in CIT's ordinary

8    business?

9    A.  Yes.

10   Q.  Where is it maintained?

11   A.  It is maintained in the WebXtender imaging system.

12   Q.  And are you able to pull up this image at any time when you

13   are reviewing that system?

14   A.  Yes.

15   Q.  And did you pull up this image in this case?

16   A.  I did.

17   Q.  Okay.  And is this screen shot or the information contained

18   within it created by someone with firsthand knowledge of the

19   information as it is input into the system?

20   A.  Yes.

21   Q.  And is it created or input by somebody with a duty to

22   report honestly and accurately within CIT's recordkeeping

23   system?

24   A.  Yes.

25   Q.  Is this a true and accurate copy of the electronic record

M2sncitf                          Shulte - Direct

1   as it is maintained by CIT?

2   A.  Yes, it is.

3        MS. NICHOLSON:  At this point in time I would like to

4   move what has been marked for identification purposes as

5   Plaintiff's Exhibit 9 into evidence.

6        MR. GOMBERG:  Note the objection by defendant, please.

7        MS. NICHOLSON:  I'm sorry.  I couldn't hear you.

8        MR. GOMBERG:  Objection by defendant, please.

9        THE COURT:  Overruled.

10  BY MS. NICHOLSON:

11  Q.  Ms. Shulte, what does this screen show?

12  A.  This is showing the images and the dates they were imaged

13  of the note in this case.

14  Q.  And how do you know it relates to this note in this case?

15  A.  The borrower loan number is in the column that says the CPI

16  number, which is the second column over from the left.

17  Q.  Who provided this screen shot?

18  A.  I did.

19  Q.  Okay.  What is the purpose of this screen shot?

20  A.  This is showing the different times that the note was

21  imaged into our system and the dates, and on the right-hand

22  side it will show the purposes.

23  Q.  What is the first date that it was imaged in?

24  A.  The first date is August 21, 2007.

25  Q.  Okay.  What about the next date?

M2sncitf                        Shulte – Direct

1    A.  The next date is May 7, 2013.

2    Q.  And could the note have been imaged in if it wasn't in

3    possession of the custodian at the time --

4    A.  No.

5    Q.  -- that these images were made?

6    A.  No.

7    Q.  Thank you.  When you reviewed the image as it was entered

8    on May 7, 2013, did that note resemble the note that was

9    attached to the summons and complaint?

10   A.  Yes.

11          MR. GOMBERG:  Objection, your Honor.  Did she say she

12   just reviewed it on May 7, 2013, or in preparation for this

13   case?

14          THE COURT:  Ms. Nicholson, would you clarify.

15          MS. NICHOLSON:  Certainly.

16   BY MS. NICHOLSON:

17   Q.  Did you review what was imaged in, in preparation for this

18   case?

19   A.  Yes.

20   Q.  And those images, can they be adjusted after the fact?

21   A.  No.

22   Q.  So what's dated as May 7, 2013, could that image be changed

23   later?

24   A.  No.

25   Q.  So, as you reviewed the images as they were submitted in

M2sncitf                          Shulte – Direct

accordance with the dates, what did the date -- what did the

note look like on May 7, 2013?

A.   The image -- the image that was -- that was entered into

the system on 2013 is the same as what is in the complaint.

Q.   When did that change?

A.   That changed -- the image on 12/9/2019 also matched the

complaint.   The image on January 9, 2020, is the image of the

document you have in your possession.   So it changed somewhere

between -- that's when the treasury department changed the

allonges at the end of the note.

Q.   Do you know why they changed those allonges?

A.   It is in their procedure to update the allonges as -- when

they get -- when they have them in their possession.   And

treasury had them in their possession due to the loan sale in

2019.

Q.   Did that sale go through?

A.   No.

Q.   Thank you.

          THE COURT:   Mr. Gomberg, any further objection?

          MR. GOMBERG:   Well, your Honor, again --

          THE COURT:   You may proceed.

          MR. GOMBERG:   Go ahead.   My objection has already been

noted.

          Thank you, your Honor.

          THE COURT:   Objection overruled.

M2sncitf                          Shulte - Direct

1            MS. NICHOLSON:  Thank you.

2            I just want to be clear for the record.  I did move

3    this into evidence as Plaintiff's Exhibit 9.  Okay.

4            THE COURT:  Exhibit 9 admitted.  The objection is

5    recorded.

6            (Plaintiff's Exhibit 9 received in evidence)

7            MS. NICHOLSON:  Thank you.

8            MR. GOMBERG:  Your Honor, the objection is overruled?

9    I didn't hear the response.

10           THE COURT:  The objection was overruled.

11           MR. GOMBERG:  Thank you, your Honor.

12           MS. NICHOLSON:  I am pulling up what is marked for

13   identification purposes as Plaintiff's Exhibit 11.

14   BY MS. NICHOLSON:

15   Q.  Ms. Shulte, can you see this on your screen?

16   A.  Yes.  Can you make it just a bit smaller.

17   Q.  I can.

18   A.  Thank you.  Perfect.

19   Q.  Ms. Shulte, can you identify this document?

20   A.  That is also a copy of the 90-day notice.

21   Q.  Okay.  And is this notice created in the ordinary course of

22   CIT's business?

23   A.  Yes.

24   Q.  Is this document maintained in the ordinary course of CIT's

25   business?

M2sncitf                        Shulte - Direct

1    A.  Yes.

2    Q.  Where is it maintained?

3    A.  In WebXtender imaging.

4    Q.  And is this document created near or at the time that the

5    90-day notice was mailed?

6    A.  Yes.

7    Q.  Is this document created --

8            THE COURT:  Excuse me, Ms. Nicholson.  Let me just

9    stop you there for a moment.  We've already admitted this same

10   document.  Is there any indication of any difference between

11   this exhibit and the one that we have already admitted?

12           MS. NICHOLSON:  Yes, your Honor.  This is the 90-day

13   notice that was mailed first-class mail.

14           THE COURT:  All right.  Proceed.

15           MS. NICHOLSON:   Thank you.

16   BY MS. NICHOLSON:

17   Q.  I'm sorry.  Where is this maintained?

18   A.  WebXtender imaging.

19   Q.  Okay.  And is the information contained in this notice

20   created by someone with a duty to report honestly and

21   accurately within the recordkeeping system?

22   A.  Yes.

23   Q.  And is this document or notice created by someone with

24   firsthand knowledge of the information it contains?

25   A.  Yes.

M2sncitf                          Shulte - Direct

1    Q.  And is this a true and accurate copy of the electronic

2    record as it is maintained by CIT?

3    A.  Yes.

4    Q.  And is this the 90-notice as it pertains to this loan?

5    A.  Yes, it is.

6              MS. NICHOLSON:  At this time I would like to move what

7    has been marked as Plaintiff's Exhibit 11 into evidence.

8              THE COURT:  Mr. Gomberg.

9              MR. GOMBERG:  Objection, your Honor.

10             THE COURT:  Overruled.

11             MR. GOMBERG:  No objection.

12             THE COURT:  Admitted without objection.

13             (Plaintiff's Exhibit 11 received in evidence)

14             MS. NICHOLSON:  Thank you.

15   BY MS. NICHOLSON:

16   Q.  Ms. Shulte, how do you know that this loan, that this

17   notice pertained to this loan?

18   A.  The borrower name and the address.

19   Q.  Okay.  Is there any other identifying information?

20   A.  On this page, there's the loan number and the property

21   address.

22   Q.  And what is the property address?

23   A.  64 Clinton Place, Bronx, New York 10453-1422.

24   Q.  Okay.  And how was this notice mailed?

25   A.  This one was first class.

1          MR. GOMBERG:  Objection, your Honor, to the question.

2     She has not -- the witness has not provided any testimony as to

3     having knowledge of the mail practices and procedures of the

4     plaintiff in this case or the company that sent this notice.

5          THE COURT:  Ms. Nicholson, elaborate and clarify.

6     BY MS. NICHOLSON:

7     Q.  Ms. Shulte, on the first page of this, does it state how

8     it's mailed?

9     A.  Yes.

10    Q.  And what does it say on its face?

11    A.  It's got the bar code and the number for mailing.  Also

12    first-class mailing on the top right of the address page.

13    Q.  Thank you.

14         THE COURT:  Objection overruled.

15         Please proceed.

16         MS. NICHOLSON:  Thank you, your Honor.

17         I move to have Exhibit 11 admitted into evidence.  I

18    believe I already did that.  All right.

19         THE COURT:  Exhibit 11 has been admitted into

20    evidence.

21         Proceed.

22    BY MS. NICHOLSON:

23    Q.  Ms. Shulte, can you identify this document, which has been

24    market for identification purposes as Exhibit 12?

25    A.  Can you make it a little smaller.

1  Q.  Sure.

2  A.  Can I see -- can I see the letter page.

3  Q.  Certainly.

4  A.  Thank you.  That's the 30-day notice.

5  Q.  Okay.  And is this notice created in the ordinary course of

6  CIT's business?

7  A.  Yes.

8  Q.  Is this document created -- or, sorry, maintained in the

9  ordinary course of CIT's business?

10  A.  Yes.

11  Q.  Where is it maintained?

12  A.  WebXtender imaging.

13  Q.  You have access to WebXtender imaging?

14  A.  Yes.

15  Q.  Did you review this notice within that system?

16  A.  I did.

17  Q.  And is this document created near or at the time of the

18  mailing it depicts?

19  A.  Yes.

20  Q.  And is this document created by someone with firsthand

21  knowledge of the 30-day -- what's required to be in the 30-day

22  demand letter?

23  A.  Yes.

24  Q.  And is this document created by someone with a duty to

25  report honestly and accurately within CIT's recordkeeping

M2sncitf                          Shulte - Direct

1    system?

2    A.   Yes.

3    Q.   And is this a true and accurate copy of the electronic

4    record as it is maintained by CIT?

5    A.   Yes, it is.

6            MS. NICHOLSON:   At this point in time I would like to

7    move what has been marked as Plaintiff's Exhibit 12 into

8    evidence.

9            MR. GOMBERG:   Objection, your Honor.

10           THE COURT:   Overruled.

11           MS. NICHOLSON:   Is the document admitted into

12   evidence?

13           THE COURT:   Yes.   Admitted into evidence.

14           (Plaintiff's Exhibit 12 received in evidence)

15   BY MS. NICHOLSON:

16   Q.   Now, Ms. Shulte, can you identify how you know that this

17   30-day demand letter relates to this loan that's the subject of

18   this foreclosure?

19   A.   The borrower name and address is on this page.

20   Q.   What is that?

21   A.   The Ramon Neris, 64 Clinton Place, Bronx, New York

22   10453-1422.

23   Q.   Is there any other identifying information?

24   A.   On this first page the loan number is on.

25   Q.   Can you just read the last four digits of that loan number?

M2sncitf                         Shulte - Direct

1    A.  2454.

2            MS. NICHOLSON:  Your Honor, for the record, I am not

3    going to have the witness read the entire loan number, as that

4    would then become part of the transcript, and it cannot be made

5    public.

6    BY MS. NICHOLSON:

7    Q.  Now, Ms. Shulte, what is the purpose of this letter?

8    A.  This letter is mandated by the mortgage document that it

9    must be sent to the borrower allowing them at least 30 days to

10   clear the default prior to commencing a foreclosure action.

11   Q.  Can you look in the upper right-hand corner of this page.

12           How is this notice mailed?  What does it say?

13   A.  This one is certified mail.

14   Q.  How do you know?

15   A.  By the certified note here on the first page, top right

16   corner.

17   Q.  Okay.  Ms. Shulte, can you identify this document?

18   A.  Can you make it a little bit smaller, and can I see the

19   first page of the letter?

20   Q.  Sure.

21   A.  That is also a copy of the 30-day notice.

22   Q.  Okay.  And is this notice created in the ordinary course of

23   CIT's business?

24   A.  Yes.

25   Q.  And is this notice maintained in the ordinary course of

M2sncitf                          Shulte – Direct

1   CIT's business?

2   A.  Yes.

3   Q.  Where is it maintained?

4   A.  WebXtender imaging.

5   Q.  Do you have access to WebXtender imaging?

6   A.  Yes.

7   Q.  Did you review this document within that system?

8   A.  I did.

9   Q.  Is this a true and accurate copy of the electronic record

10  as it is maintained by CIT?

11  A.  Yes.

12  Q.  And is this notice created by someone with a duty to report

13  honestly and accurately within CIT's recordkeeping system?

14  A.  Yes.

15  Q.  And is the information contained within the notice created

16  by someone with firsthand knowledge of the information therein?

17  A.  Yes.

18          MS. NICHOLSON:  At this point in time I would like to

19  move what has been marked as Plaintiff's Exhibit 13 into

20  evidence.

21          MR. GOMBERG:  I will note my objection, your Honor.

22          THE COURT:  Admitted.

23          (Plaintiff's Exhibit 13 received in evidence)

24          THE COURT:  Objection noted.

25          MS. NICHOLSON:  Thank you.

M2sncitf                         Shulte - Direct

 1   BY MS. NICHOLSON:

 2   Q.  Ms. Shulte, what is the purpose of this letter?

 3   A.  This is --

 4             MR. GOMBERG:  Not to interrupt.  I just wanted to make

 5   sure.  I didn't hear.  Maybe my own system isn't -- was the

 6   objection overruled, your Honor?

 7             MS. NICHOLSON:  I can't hear you.

 8             THE COURT:  The objection was overruled.

 9             MR. GOMBERG:  Thank you, your Honor.

10   BY MS. NICHOLSON:

11   Q.  Ms. Shulte, what is the purpose of this letter?

12   A.  This is required by the mortgage to be sent to the borrower

13   allowing them 30 days notice to -- allowing them 30 days to

14   clear the default prior to foreclosure action.

15   Q.  How do you know this notice relates to this loan and this

16   foreclosure action?

17   A.  The borrower name and address on this page.

18   Q.  Which are?

19   A.  Ramon Neris, 64 Clinton Place, Bronx, New York 10453-1422.

20   Q.  Is there any other identifying information?

21   A.  The loan number here on this first page.

22   Q.  What are the last four digits of the loan number?

23   A.  2454.

24   Q.  And looking at the first page, how is this mailed?

25   A.  First-class mail.

M2sncitf                          Shulte - Direct

1    Q.  Where are you reading that?

2    A.  The top right corner.  Also the bar code tells me.

3    Q.  Now I am going to direct you to look at Plaintiff's Exhibit

4    2, specifically paragraph 15.  What does it state in paragraph

5    15 of the mortgage?  Can you just read the first two sentences?

6    A.  "All notices" --

7    Q.  Can you start with the title, please.

8    A.  Sorry.  "Notices Required Under the Security Instrument.

9    All notices given to me or lender in connection with this

10   security instrument will be in writing.  Any notice to me in

11   connection with this security instrument is considered given to

12   me when mailed first-class mail or when actually delivered to

13   my notice address if sent by other means."

14   Q.  Thank you.

15           Ms. Shulte, can you identify this document?

16   A.  Yes.

17   Q.  What do you identify it as?

18   A.  It is a transaction report of mailing sent to this

19   borrower.

20   Q.  Okay.  Can you describe to me the process by which CIT sent

21   its notices.

22   A.  CIT has a vendor, Covius Walz, that they had a shared

23   portal that shared information.  CIT would send all the

24   information and the template to Covius Walz, who would generate

25   the letter and mail on our behalf.

M2sncitf                          Shulte - Direct

1    Q.  And this transaction report, is this created in the

2    ordinary course of CIT's business?

3    A.  Yes.

4    Q.  And is this a document that is maintained within CIT's

5    business recordkeeping system?

6    A.  Yes, yes.

7    Q.  And is this document created at or near the time mailings

8    are done?

9    A.  Yes.

10   Q.  And is this document created by someone with firsthand

11   knowledge of the mailings that it depicts?

12   A.  Yes.

13   Q.  And is this document created by someone with a duty to

14   report honestly and accurately within the recordkeeping system?

15   A.  Yes.

16   Q.  And is this a true and accurate copy of the electronic

17   record as it is maintained by CIT?

18   A.  Yes.

19   Q.  And is the information contained herein incorporated into

20   CIT's business recordkeeping system?

21   A.  Yes.

22   Q.  Where is it incorporated?

23   A.  This is in the mortgage servicing oversight share point

24   site.

25   Q.  And is this document relied upon by CIT in regards to

M2sncitf                    Shulte - Direct

```
 1  identifying mailings when they were sent, etc.?
 2  A.  Yes.
 3          MS. NICHOLSON:  Thank you.
 4          At this point in time I would like to move this
 5  document into evidence as Plaintiff's Exhibit -- I believe it
 6  is 14.
 7          MR. GOMBERG:  The defendant objects, your Honor.
 8          THE COURT:  The objection is noted and overruled.
 9          Proceed.
10          (Plaintiff's Exhibit 14 received in evidence)
11          MS. NICHOLSON:  Is the document admitted into
12  evidence?
13          THE COURT:  The document Exhibit 14 is admitted into
14  evidence.
15          MS. NICHOLSON:  Thank you.
16  BY MS. NICHOLSON:
17  Q.  Now, Ms. Shulte, can you explain to us what information
18  this document contains.
19  A.  The column that says article number is the number
20  associated with either the first-class or the certified
21  mailing.
22          The reference number in the third column over is the
23  borrower loan number.
24          The record indicator is the code associated with the
25  letter that was sent to the borrower.
```

1          The next column UPS service type is the type of mail,

2     certified, first class, etc.

3          And then the borrower name and address, the date the

4     document was mailed, the status showing -- this is how it moved

5     along in the mailing system.  It will say when it's mailed and

6     how it's mailed.

7          And then the last column is the postage fees for the

8     document.

9     Q.  Okay.  And now moving back to what has been admitted into

10    evidence as Plaintiff's Exhibit 10, what is the mailing number

11    on this?

12    A.  The tracking number is 9307110011700929717731.

13    Q.  And is that mailing indicated on this document?

14    A.  Yes.  There.  Line 11.

15    Q.  Okay.  And does that article number match the article

16    number as depicted in -- on the 90-day notice that has been

17    admitted into evidence as Plaintiff's Exhibit 10?

18    A.  Yes.

19    Q.  And what is this reference number here ending in 2454?

20    A.  That's the borrower number, the loan number.

21    Q.  Does that match CIT's records for this loan in this

22    foreclosure action?

23    A.  Yes.

24    Q.  What does XC719 indicate?

25    A.  That is the letter type, which is the 90-day notice.

1    Q.  Is that found on the notice?

2    A.  Yes.  The bottom right corner of the address page.

3    Q.  And what does the next column indicate?

4    A.  The next column is that it was sent certified.

5    Q.  And where was it sent to?

6    A.  To 64 Clinton Place, Bronx, New York 10453-1422.

7    Q.  And what was the date that it was mailed?

8    A.  September 26, 2017.

9    Q.  And what was the status?

10   A.  It was confirmed event by the post office.

11   Q.  Would this entry have been made into this transaction

12   report had the notice not been mailed?

13   A.  No.

14   Q.  Would an image of the notice itself be imaged into your

15   system had it not been mailed?

16   A.  No.

17   Q.  Moving on to what has been admitted into evidence as

18   Plaintiff's Exhibit 11.  What is the transaction number on this

19   mailing?

20   A.  2324133686.

21   Q.  Is that mailing on this transaction report?

22   A.  Yes, row 12.

23   Q.  And does that article number match the article number on

24   what has been admitted into evidence as Plaintiff's Exhibit 11?

25   A.  Yes, it does.

M2sncitf                        Shulte - Direct

1   Q.   What about the reference number?  What is that?

2   A.   That is the loan number; that's the same.  That matches.

3   Q.   How about the record indicator?

4   A.   That is the document that was sent, which is the 90-day

5   notice that matches the lower right corner of the address page.

6   Q.   And --

7           MR. GOMBERG:  I apologize.

8           Can we just note, because I can't see, can we note

9   what the last four digits of the mortgage loan number that's

10  referenced there for the second column is.  I can't see it.

11  Unless your Honor --

12  BY MS. NICHOLSON:

13  Q.   Ms. Shulte, can you read off the last four digits of the

14  reference number?

15  A.   2454.

16  Q.   And is that CIT's loan number?

17  A.   Yes.

18  Q.   What about the next column?

19  A.   That is the type of service.  It was mailed first class.

20  Q.   Where was it mailed to?

21  A.   64 Clinton Place, Bronx, New York 10453-1422.

22  Q.   And what is the date of mailing?

23  A.   September 26, 2017.

24  Q.   What about the next column?  The status?

25  A.   The post office confirms the event.

M2sncitf                    Shulte - Direct

1   Q.  And how about the next column?

2   A.  That's the postage amount.

3   Q.  Would this have been put into the transaction report had

4   the notice not been mailed?

5   A.  No.

6   Q.  And would a full image of the 90-day notice that you

7   testified to as Plaintiff's Exhibit 11, would that be in CIT's

8   system if the notice had not been mailed?

9   A.  No.

10  Q.  Now, referring to what was admitted into evidence as

11  Plaintiff's 12, is this document also on the transaction

12  report?

13  A.  Yes.

14  Q.  And how do you know?

15  A.  I saw it on the transaction report when you were showing

16  it.

17  Q.  What does the -- what is the number -- let me see here.

18          What is the article number?

19  A.  The article number on that -- this one is

20  9307110011700929902120.

21  Q.  Do you see that on this transaction report?

22  A.  Yes, line 9.

23  Q.  Okay.  And does that article number match what has been

24  admitted into evidence as Plaintiff's Exhibit 12?

25  A.  Yes.

M2sncitf                         Shulte - Direct

1   Q.  And what about the reference number?  What are the last

2   four digits?

3   A.  2454.

4   Q.  Does that match the loan number as this loan is maintained

5   by CIT?

6   A.  Yes.

7   Q.  What about the authentication column?

8   A.  That notes the type of letter mailed.

9   Q.  And is that on the notice itself?

10  A.  Yes.  The first page, the address page, lower right corner.

11  Q.  And how was that mailed?

12  A.  Certified mail.

13  Q.  And to -- what is the next column?

14  A.  The borrower name and address.

15  Q.  Which is?

16  A.  Ramon Neris, 64 Clinton Place, Bronx, New York 10453-1422.

17  Q.  And what is the date that it was mailed according to the

18  next column?

19  A.  September 27, 2017.

20  Q.  And what was the status according to the next column?

21  A.  Postal service confirm event.

22  Q.  What about the next column?

23  A.  The postage paid.

24  Q.  Okay.  Would this entry be made into the transaction report

25  if the notice had not been mailed?

M2sncitf                          Shulte - Direct

1    A.  No.

2    Q.  And would the image as it exists as Plaintiff's Exhibit 12

3    exist in CIT's imaging system had the notice not been mailed?

4    A.  No.

5    Q.  Thank you.  And now referring to what has been admitted

6    into evidence as Plaintiff's Exhibit 13, what is the article

7    number?

8    A.  2324157822.

9    Q.  And looking at the transaction report, can you identify

10   this article number on this report?

11   A.  Yes, page 10.

12   Q.  Page?

13   A.  Sorry, row 10.

14   Q.  Row 10.  Okay.  Does that article number match what's on

15   the notice?

16   A.  Yes.

17   Q.  And what about the reference number?  Is that the same

18   reference number that is for this loan?

19   A.  Yes, 2454.

20   Q.  And that's CIT's loan number?

21   A.  Yes.

22   Q.  And what about the record indicator?

23   A.  The type of letter sent.

24   Q.  And is that on the notice itself?

25   A.  Yes.

M2sncitf                              Shulte - Direct

1    Q.  And where can that be found?

2    A.  Lower right corner of the address page.

3    Q.  And does this indicate how the notice was mailed?

4    A.  Yes.  First-class mail.

5    Q.  And to where?

6    A.  To Ramon Neris at 62 Clinton Place, Bronx, New York

7    10453-1422.

8    Q.  And the date that it was mailed?

9    A.  September 27, 2017.

10   Q.  And what does the next column indicate?

11   A.  The postal service confirmed event.

12   Q.  And what about the next column?

13   A.  Postage paid.

14   Q.  Would this entry exist if the notice had not been mailed?

15   A.  No.

16   Q.  Would a copy of Plaintiff's Exhibit 13 the way that it --

17   would that be fully imaged into CIT's system if it had not been

18   mailed?

19   A.  No.

20   Q.  And does all of the information on the notices match the

21   information on this transaction report?

22   A.  Yes.

23   Q.  Thank you.  Ms. Shulte, can you identify this document?

24   A.  Yes.  This is proof of mailing statement for New York.

25   Q.  Okay.  Is this document created in the ordinary course of

M2sncitf                        Shulte - Direct

1   CIT's business?

2   A.   Yes.

3   Q.   And is this maintained in the ordinary course of CIT's

4   business?

5   A.   Yes.

6   Q.   Where is it maintained?

7   A.   In WebXtender imaging.

8   Q.   And is this document created at or near the time that the

9   90-notices are mailed?

10  A.   Yes.

11  Q.   And is this document created by somebody with firsthand

12  knowledge of the mailing information for the 90-day notice?

13  A.   Yes.

14  Q.   And is this document created by somebody with a duty to

15  report honestly and accurately within CIT's recordkeeping

16  system?

17  A.   Yes.

18  Q.   Is this a true and accurate copy of the electronic record

19  as it is maintained by CIT?

20  A.   Yes.

21  Q.   Is it a true and accurate copy of the electronic record as

22  it is maintained in relation to this loan?

23  A.   Yes.

24          MS. NICHOLSON:  At this point in time I would like to

25  move what has been marked as plaintiff's Exhibit 15 into

1    evidence?

2              MR. GOMBERG:  Objection, your Honor.

3              THE COURT:  Objection overruled.

4              The document is admitted.

5              (Plaintiff's Exhibit 15 received in evidence)

6              MS. NICHOLSON:  Thank you.

7    Q.  Ms. Shulte, what this document?

8    A.  This is the proof of filing statement, the 1306.

9    Q.  And is in relation to the loan that is the subject of this

10   foreclosure action?

11   A.  Yes.

12   Q.  How do you know?

13   A.  It has the borrower address, the CIT loan number, and

14   borrow's name.

15   Q.  And when was the filing completed according to this

16   document?

17   A.  The filing was September 27, 2017.

18   Q.  And to what property address?

19   A.  64 Clinton Place, Bronx, New York 10453.

20   Q.  Thank you.  Ms. Shulte, can you identify this document?

21   A.  Yes, that's the limited power of attorney.

22   Q.  And is this document created in the ordinary course of

23   CIT's business?

24   A.  Yes.

25   Q.  Is this document maintained in the ordinary course of CIT's

M2sncitf                          Shulte - Direct

1   business?

2   A.  Yes.

3   Q.  Where is it maintained?

4   A.  This is in the mortgage servicing oversight share point

5   site.

6   Q.  And do you have access to that system?

7   A.  Yes.

8   Q.  Were you able to review this document within that system?

9   A.  Yes.

10  Q.  Is this document created at or near the time of the

11  relationship between CIT and LoanCare?

12  A.  Yes.

13  Q.  And is this document created by someone with firsthand

14  knowledge of the relationship between CIT and LoanCare?

15  A.  Yes.

16  Q.  And is this document created by somebody within CIT's

17  recordkeeping system who has a duty to report honestly and

18  accurately within that system?

19  A.  Yes.

20  Q.  Is this a true and accurate copy of the electronic record

21  as it is maintained by CIT and that you reviewed within the

22  system?

23  A.  Yes.

24          MS. NICHOLSON:  At this point in time I would like to

25  move to have what has been marked as Plaintiff's Exhibit 16

M2sncitf                         Shulte - Direct

1   into evidence.

2              MR. GOMBERG:  I have an objection your Honor.

3              Foundation.

4              THE COURT:  Overruled.  The document is admitted.

5              (Plaintiff's Exhibit 16 received in evidence)

6              MS. NICHOLSON:  Thank you.

7   Q.  Ms. Shulte, what is the purpose of this document?

8   A.  Giving the subservicer, LoanCare, authority to service the

9   loan -- mortgage loans on their behalf.

10  Q.  Okay.  What does that consist of, servicing a mortgage

11  loan?

12  A.  See -- LoanCare handles all the day-to-day servicing of the

13  loans.  That includes payment, payment amounts, the

14  foreclosure, foreclosure actions, they prepare documents for

15  court, all the day-to-day servicing of the loans.

16  Q.  When did LoanCare become servicer for this loan?

17  A.  2018.  I don't know the month.

18  Q.  Okay.  In 2018, would LoanCare have been taken over day --

19  monthly payments?

20  A.  Yes.

21  Q.  Would they have taken over distribution of escrow?

22  A.  Yes.

23             MS. NICHOLSON:  Okay.  Thank you.  At this point in

24  time I have no further questions for this witness, your Honor.

25             THE COURT:  Thank you.

M2sncitf                        Shulte - Direct

1              Mr. Gomberg, do you have any questions for the

2      witness?

3              MR. GOMBERG:  Yes, your Honor.  Can I have a

4      two-minute bathroom break before starting the

5      cross-examination?

6              THE COURT:  Yes.  We will take a two-minute recess.

7              We are taking a recess.  Thank you.

8              (Recess)

9              THE COURT:  Mr. Gomberg has returned.  Let's proceed.

10             Mr. Gomberg, any cross-examination of this witness?

11             MR. GOMBERG:  Your Honor, I am going to try to share

12     my screen here if possible.  In a moment.  I just wanted to

13     make sure that this works.

14             Ms. Nicholson, is it possible to share your ability to

15     share the screen?

16             MS. NICHOLSON:  I'll try.

17             Okay.  Here we go.  I think you can share now.

18             MR. GOMBERG:  Is that working?

19             MS. NICHOLSON:  I don't see anything on my screen.

20             THE WITNESS:  Neither do I.

21             MS. NICHOLSON:  Try now.

22             MR. GOMBERG:  Okay.  So I will do a new share.  Maybe

23     desktop is the way to do it.  How about now?  It says I'm

24     sharing the screen.  Can you see it now?

25             THE WITNESS:  No.

M2sncitf                         Shulte – Cross

1              MS. NICHOLSON:  No, I can't either.

2              THE COURT:  Ms. Nicholson, you might need to stop

3    sharing your screen.

4              MS. NICHOLSON:  I've stopped screen sharing.

5              MR. GOMBERG:  Is my screen visible now?

6              THE WITNESS:  I can see.

7              MR. GOMBERG:  It is a picture of the note?

8              THE WITNESS:  Yes.

9              MR. GOMBERG:  Now that I know that it works let me

10   stop and ask a few questions here before we go on.

11   CROSS EXAMINATION

12   BY MR. GOMBERG:

13   Q.  You stated that your position is an associate for CIT Bank,

14   is that correct?

15   A.  Yes.

16   Q.  And what were your duties and responsibilities as an

17   associate?

18   A.  My duties include oversight of the subservicer, policies

19   and procedures as they pertain to the subservicer.  I do

20   document review.  I am a notary.  And I manage all the purchase

21   orders and approve payments of invoices for all vendors.

22   Q.  Do you review subservicers' records?

23   A.  Yes.

24   Q.  How do you access their records?

25   A.  Their records are in our -- integrated into our mortgage

M2sncitf                      Shulte - Cross

1   information knowledge, which is MIK.

2   Q.  And when did those become integrated into your system?

3   A.  In 2018, when we subserviced the loans to LoanCare.

4   Q.  When was this -- the documents that were provided, namely,

5   the mail requirements, when were those mailed out?

6   A.  Those --

7   Q.  Let me specify.  Prior to or after the hiring of the

8   subservicer that you referred to, LoanCare?

9   A.  Prior to.

10  Q.  And as to the records, prior to LoanCare being hired as a

11  subservicer, what is your ability to access those records?

12  A.  Those are in our WebXtender imaging system, and they are

13  all available.

14  Q.  Is one of your duties and responsibilities to review

15  records that are maintained by CIT care as well as any

16  subservicer, or is it just for subservicing?

17  A.  For anything from CIT or the subservicer.

18  Q.  Did you have an opportunity to personally review any of the

19  documents in this case prior to appearing for testimony?

20  A.  Yes.

21  Q.  And what -- better yet, did you review in person the note

22  in this case?

23  A.  Yes.

24  Q.  When did you review the -- the original note?  Did you

25  review the original note?

M2sncitf                      Shulte - Cross

1    A.  Yes, yes.

2    Q.  When you say original note, there are two notes that have

3    been shown in this case, one of them being that was purported

4    to be the note prior to commencement of this action, one of

5    them being the note in its current state.

6    A.  Yes.

7    Q.  Which of them did you see personally?

8    A.  Both.

9    Q.  When did you see the note that is -- you know what, let's

10   show the note first and we can ask the questions.

11          MR. GOMBERG:  Is my screen being shared?

12   A.  Yes.

13          MS. NICHOLSON:  Yes.

14   Q.  I believe this is what has been admitted into evidence as

15   Exhibit 5.  It looks like the complaint.  I am going to show

16   you the note that is included with the complaint here.  Can you

17   note what the last four digits of the loan number on this

18   complaint -- on this note?

19   A.  This is -- this loan number is 4183.  It is a different --

20   we have different loan numbers, MIK -- there is a MIK's number

21   and an SBO number.  That's the SBO number.

22   Q.  This note that we are looking at right here is -- is this a

23   copy of the note, or was this an actual true copy of what the

24   note looked like at the time of the filing of this action?

25   A.  This is a true copy of the note.

M2sncitf                    Shulte - Cross

1    Q.  We are looking here at page 10 of 17 on Exhibit 5.

2              Is there an endorsement included on this page?

3    A.  Yes.

4    Q.  Can you describe this endorsement?

5    A.  This endorsement is signed by Vincent Dombroski from

6    IndyMac Bank to blank.

7    Q.  Now looking at page 11 of 17, do you note any notations on

8    what appears to be the allonge to the note?

9    A.  Just that the loan number is circled.  I am not sure what

10   that writing is on the right.

11   Q.  The writing that you are referring to is something that

12   seemed to say 1MFBOC?

13   A.  Right.

14   Q.  What is that?

15   A.  I don't know what that is.

16   Q.  There is an endorsement included on this allonge?

17   A.  Yes.

18   Q.  Can you describe the endorsement, please.

19   A.  This is the FDIC as receiver for IndyMac Federal Bank FSB,

20   successor to IndyMac FSB, to OneWest Bank FSB.

21   Q.  Was this in blank or is it a specific endorsement?

22   A.  It is a specific endorsement.

23   Q.  The specific endorsement is to who?

24   A.  To OneWest Bank.

25   Q.  And, once again, what's the loan number by the way that's

M2sncitf                        Shulte - Cross

1    circled?

2    A.   It's ending in 4183.

3    Q.   Thank you.  Whenever I ask for a loan number, if you could

4    do the last four digits, that would be great.  I appreciate

5    that.

6    A.   Okay.

7    Q.   There is a -- now we're looking at what's page 12 of 17

8    here.  It looks like -- the document marked "Allonge to Note."

9              Do you see what I'm referring to?

10   A.   Yes.

11   Q.   Are there any notations on this document?

12   A.   No.

13   Q.   And the last four digits of the loan number listed on this

14   document is?

15   A.   4183.

16   Q.   Now, what -- do you see any endorsements on this page?

17   A.   Yes.

18   Q.   Can you describe the endorsement?

19   A.   This endorsement is from OneWest Bank to blank.

20   Q.   Who is the endorsement signed from as the endorsee?

21   A.   Sandra Schneider.

22   Q.   Endorser.  Sara -- Sandra Schneider you said?

23   A.   Sandra Schneider, vice president.

24   Q.   Vice president of what?

25   A.   Of OneWest Bank.

1  Q.  All right.  Just going back to the page beforehand, on page

2  11.  We are looking at the first allonge to note that we

3  discussed.  It also has the specific endorsement that you

4  described.

5       Who is this specific endorsement signed by?

6  A.  Sandy Schneider.

7  Q.  Sandra Schneider?

8  A.  Sandra Schneider, sorry.  Yes.

9  Q.  What is her -- in what capacity does she sign this

10  endorsement?

11  A.  Attorney-in-fact for FDIC.

12  Q.  Now, I am going to go to -- at the -- when you -- what you

13  stated that you reviewed original document --

14  A.  Yes.

15  Q.  -- original note.

16       With the allonges?

17  A.  Yes.

18  Q.  And when -- at the time that you reviewed this document,

19  did these notations appear?

20  A.  Yes.

21  Q.  Including the 1FMBOC notation?

22  A.  I believe so.  I would have to see them.  I don't recall

23  each of the notations on it.

24  Q.  Can you describe what you -- what you described -- what do

25  you mean?

M2sncitf                    Shulte - Cross

1  A.  I don't -- I can't recall the I -- 1MF.  I would have to

2  see it again.  But I believe these are all the same.  It's the

3  same note that was in our imaging.

4  Q.  Well, I am asking about your -- you stated that you

5  personally reviewed --

6  A.  Yes.

7  Q.  -- along with the allonges.

8       So, at the time that you personally reviewed this note

9  that is annexed to the complaint that was submitted in this

10  case, were these notations as they appear and being shown to

11  you today apparent --

12  A.  Yes.

13  Q.  -- here?

14  A.  Yes.

15  Q.  I show you what has been marked -- what's been admitted as

16  Exhibit 1, I believe.  It looks like Exhibit 1.  Yeah.  I am

17  just waiting for this to go away so I can put it back on.  Oh.

18       Now, this is the -- can you describe this document,

19  Exhibit 1, what we're -- we're looking at here?

20  A.  This is the note to the mortgage.

21  Q.  And at what time is this note?

22  A.  The date on this note is August 15, 2007.

23  Q.  And you stated that you reviewed this note as well?

24  A.  Yes.

25  Q.  And when did you review this note?

1   A.  Within the last two weeks.

2   Q.  Do you see the attorney certification found on the top

3   right?

4   A.  Yes.

5   Q.  Was that there when you reviewed the note?

6   A.  Yes.

7   Q.  Now, we are looking at page 5 of 8 of Exhibit 1.  Is

8   there -- do you see that there is a loan number listed at the

9   bottom left?  What are the last four digits of that loan

10  number?

11  A.  I don't see one on this page that you are showing me, or

12  maybe it's below -- sorry.  Can you just go down on the screen.

13  Q.  Let me see if I can zoom in here.  There we go.  Can you

14  see it now?

15  A.  Yes, 4183.

16  Q.  And this attorney certification that is stamped here, is

17  that -- was that the note when you reviewed it?

18  A.  Yes.

19  Q.  You see the endorsement here is crossed out?

20  A.  Yes.

21  Q.  Do you know who crossed out this endorsement?

22  A.  Yes, our treasury department.

23  Q.  Who is the endorsement here originally listed by?

24  A.  Vincent Dombroski.

25  Q.  Vice president of who?  Do you know?

1    A.  Of IndyMac Bank.

2    Q.  And it was endorsed in blank, correct?

3    A.  Yes, correct.

4    Q.  Do you know why it was crossed out?

5    A.  The treasury department would update the allonges as they,

6    as time went by.

7    Q.  Do you know what an allonge -- first of all, this is not an

8    allonge.  Do you mean the endorsement?

9    A.  The endorsement.

10   Q.  Do you know what an endorsement is for?

11   A.  It's endorsing the loan to a different entity.

12   Q.  And an endorsement in blank specifically.  Do you know what

13   that is -- what its purpose is?

14   A.  I don't have the exact definition.

15   Q.  Is it fair to say that an endorsement in blank is endorsed

16   to anybody who has possession of the note?

17   A.  That -- I'm sorry.  Can you repeat that?

18   Q.  Is it a fair statement to say that endorsement in blank

19   allows anybody who is possessing the note to be the holder of

20   the note?

21   A.  Yes.

22   Q.  And what is your knowledge of the treasury department that

23   you state did the voiding or the crossing out of this

24   endorsement blank?  Do you have --

25   A.  The treasury --

M2sncitf                        Shulte - Cross

1    Q.   -- contact with them?

2    A.   Yes.  The treasury department handles our original loan

3    documents, the collateral file to the loan documents.  And they

4    manage with our custodian.

5    Q.   You don't know why it would be crossed out other than the

6    fact that the treasury department would have done it?

7    A.   They update the alloments or they update the documents when

8    they have them in their possession.

9    Q.   My question is just very simply if you are aware of the

10   reasoning for crossing out of the endorsement in blank as we

11   see on page 5 of 18 of Exhibit --

12   A.   No, no.

13   Q.   This attorney's certification as well on the bottom right,

14   do you see that?

15   A.   Yes.

16   Q.   Is that in the original note which we had discussed in

17   Exhibit 5 as well as this note that you said you inspected

18   about two weeks prior?

19   A.   So, the original note, the note that's in the attorney's

20   possession or the original note in our imaging system?  I'm

21   sorry.

22   Q.   Exhibit 5 was the complaint --

23             MS. NICHOLSON:  Objection, your Honor.  The note was

24   attorney certified by my office for purposes of this trial.

25   Everybody is aware of that.  It was for purposes of admission

M2sncitf                     Shulte - Cross

1     into evidence because we could not have the original note since

2     it was a virtual trial.

3              MR. GOMBERG:  So the original exhibit -- so Exhibit 5

4     does not have the attorney certification, is that correct?

5     I'll even bring it up.  Here we are.

6              MS. NICHOLSON:  No.

7     Q.  All right.  This is page 6 of 8 of Exhibit 1.  Do you see

8     any markings on this note -- allonge -- what's listed as

9     allonge to note?

10    A.  No.

11    Q.  Are you aware of how -- just as a reminder, on Exhibit 5

12    the note that you stated was the original note that you looked

13    at inspected prior to -- well, actually, let's ask the

14    question.

15             When did you -- going back to Exhibit 5, when did you

16    review this note that's annexed here with the complaint as

17    Exhibit 5?

18    A.  Over the last few weeks.

19    Q.  No, no.  We are talking about Exhibit 5, not Exhibit 1.

20    This is the note with only two allonges, with the endorsement

21    that is in blank not voided out.

22    A.  Is this part of the complaint?

23    Q.  Correct.  Exhibit 5.

24    A.  So your question is?

25    Q.  When did you review this personally, as you stated

M2sncitf                    Shulte - Cross

1    previously, that you reviewed it personally?  I didn't ask

2    you --

3    A.  Over the last two weeks.

4    Q.  I'm asking -- again, let me just be clear here.  The note

5    as it appears attached to the complaint, which is what we are

6    looking at right here.  We have the complaint, and then we have

7    the note.  And the allonges here as well.  You previously

8    stated that you reviewed these.

9    A.  Yes.

10   Q.  The first note, before any voiding of the endorsement,

11   which we'll call it the second note.  The second note you

12   stated you reviewed about two weeks prior to now.  Now, this is

13   the first note -- the same note obviously, the one with the

14   notations, with the circling of the loan, with IMFBOC noted on

15   its first allonge, when did you review this note?

16   A.  Also within the last two weeks.

17   Q.  Is this not the same -- was this note in the same -- strike

18   that.

19        Did you not say that you reviewed this note that's

20   annexed to the complaint at a different date prior to two weeks

21   from today?

22   A.  No.

23   Q.  So, prior to two weeks from today, other than that one time

24   when you reviewed the note, did you ever review any of the

25   notes that have been submitted in this case?

M2sncitf                         Shulte - Cross

1    A.  No.

2    Q.  Is it now your testimony that when you reviewed the note,

3    these marking, as I'm showing you now, on Exhibit 5, page 11 of

4    17, appeared on the note when you physically inspected the

5    note?

6    A.  I said I didn't recall.

7    Q.  Did you not say that the circling -- you certainly --

8              MS. NICHOLSON:  Objection.  Asked and answered.

9              The witness said she didn't recall.

10             THE COURT:  Sustained.

11   BY MR. GOMBERG:

12   Q.  Now we are going back to Exhibit 1 here, which is, correct

13   me if I'm wrong, the note that you reviewed two weeks prior to

14   today's date, is that correct?

15   A.  Yes.

16   Q.  This note, again, just to clarify, did you ever review this

17   note other than prior to two weeks from today's date?

18   A.  No.

19   Q.  So you never reviewed the note prior to the commencement of

20   this action?

21   A.  No.

22   Q.  Now looking at page 7 of the eight-page document that's in

23   Exhibit A -- you can still see my screen, correct?

24   A.  Yes.

25   Q.  Looking at page 7 of the allonge to the note as Exhibit 1,

M2sncitf                     Shulte – Cross

1   do you see any endorsement on this document?

2   A.  Yes.

3   Q.  Can you describe the endorsement, please?

4   A.  The endorsement is signed by Sandra Schneider, vice

5   president of OneWest Bank, paid to the order of CIT Bank.

6   Q.  This is a specific endorsement to CIT specifically?

7   A.  Correct.

8   Q.  And the loan number ends in what last four digits, the top

9   left here?

10  A.  4183.

11  Q.  And the last page here, 8 of 8 of Exhibit 1, can you

12  describe what the document you are seeing here?

13  A.  The allonge to the note signed by Pamela Ota, assistant

14  vice president of CIT Bank, to blank.

15  Q.  All right.  So again the endorsement here is endorsed in

16  blank?

17  A.  Yes.

18  Q.  And who is currently in possession of the note?

19  A.  This copy is by the attorney.

20  Q.  Who currently owns the note?

21  A.  Oh, CIT Bank.

22  Q.  Did CIT Bank since -- did CIT Bank assign this note since

23  its specific endorsement as noted on page 7 of 8 of Exhibit 1?

24  A.  Have they signed --

25  Q.  Assigned.

M2sncitf                    Shulte - Cross

1   A.  -- the note?

2   Q.  Assigned.

3   A.  Assigned the note.  Has CIT assigned it?  No.

4   Q.  And can you describe why an endorsement in blank would be

5   provided from CIT Bank as we're looking at page 8 of Exhibit 1?

6   A.  Why it would be blank?

7   Q.  Why would the endorsement be in blank from CIT Bank in

8   blank, who is -- yeah.

9   A.  Because the loan is owned by CIT Bank.

10  Q.  And yet they endorsed it in blank, correct?

11  A.  Yes.

12  Q.  And are you stating that CIT Bank endorsed it in blank to

13  itself?

14  A.  I'm sorry.  I don't understand.  I don't know.

15  Q.  We previously discussed an endorsement in blank is when an

16  endorsement to the note allows for whoever's -- a transfer of

17  the note to whoever is possessing the note to have actual

18  possession of it to be the holder of the note.  That's what you

19  described earlier.

20          So here I am asking you, as we see on page 7 of

21  Exhibit 1, there has now been included, from the time of the

22  commencement of this action until now, there has now been a

23  specific, a specific endorsement on page 7 here where it was

24  not previously included.

25  A.  Correct.

M2sncitf                          Shulte – Cross

1    Q.   Before this was -- on Exhibit 5, it is an endorsement in

2    blank, correct?

3    A.   Correct.

4    Q.   And now Exhibit 1 here it is an endorsement -- a specific

5    endorsement to CIT Bank, correct?

6    A.   Correct.  To the merge of the -- of OneWest Bank to CIT

7    Bank.

8    Q.   OneWest Bank merged into CIT Bank?

9    A.   Yes.

10   Q.   When did that happen?

11   A.   2018 -- sorry, no.  2015.

12   Q.   When did the endorsement in blank that we saw here -- you

13   know, there's the specific endorsement, here's the endorsement

14   in blank.  Let me zoom out a little bit.  You see --

15   A.   The allonges aren't dated.

16   Q.   Do you have any knowledge as to when this endorsement in

17   blank from OneWest Bank was made?

18   A.   Allonges aren't dated.  It's part -- that particular

19   allonge was part of the original note.  So the time of the

20   original of the loan I would believe.

21   Q.   So you don't know when this endorsement in blank was

22   created, correct?

23   A.   For that document, that page is part of the original doc --

24   of the original note at origination.

25   Q.   So you're saying this document was created on October 1 of

M2sncitf                          Shulte - Cross

1   2007?

2   A.  No.  That is a payment date.  The date of the note is

3   August 15, 2007.

4   Q.  So, August 15, 2007, is when the -- when this page 7 --

5   page 12 here of Exhibit 5, the endorsement in blank was

6   created?

7   A.  Yes.

8   Q.  And when was the specific endorsement -- when was the

9   specific endorsement created?

10  A.  I'm sorry.  Allonges aren't dated.  So I don't have a date

11  on that.

12  Q.  Right.

13  A.  I know it's part of the document -- part of the image that

14  is -- I would have to go back and see that date again, but I

15  don't know the exact date.

16  Q.  And the merger that occurred -- do you know who Sandy

17  Schneider is by any chance?

18  A.  Yes.

19  Q.  And this Sandy Schneider worked for CIT Bank?

20  A.  Yes.

21  Q.  Do you know how long she's worked for CIT Bank?

22  A.  She no longer works for CIT Bank.  She retired.  I do not

23  know how many years she worked here.  She was here before I

24  came.

25  Q.  When did you start working at CIT Bank?

M2sncitf                          Shulte - Cross

1    A.   I can't tell you.  I don't know.

2    Q.   You don't know when you started working for CIT Bank?

3    A.   When I started?  I thought you said when she started.

4    Q.   No.  She started before you started working, but when did

5    you start working?

6            THE COURT:  Mr. Gomberg, I don't see the bearing of

7    this questioning on the issues that are here for trial.  If

8    there is no relevance, let's move on.

9            MR. GOMBERG:  Fair enough.

10            If I may just get an answer to that question, I

11    promise I will clear up the relevance at closing, but just to

12    ask how -- when the witness began working for CIT Bank.

13    A.   I started with CIT Bank -- I started with OneWest Bank in

14    September of 2009 and have been here through the merger of

15    OneWest Bank to CIT Bank.

16    Q.   So did you only start working for CIT Bank in 2018 when the

17    merger occurred?

18    A.   2009.  Well, I started with OneWest Bank in September of

19    2009, and I was here through the merger in 2015 from OneWest

20    Bank to CIT Bank.

21    Q.   Understood.

22    A.   And still currently employed.

23    Q.   All right.  I'm showing you what's been marked -- what's

24    been admitted as Exhibit 11 here.  It should just be the 90-day

25    notice.  What is the loan number as you described, the last

M2sncitf                          Shulte - Cross

1    four digits?

2    A.  2454.

3    Q.  Right.  And this 90-day notice -- does this notice

4    contain -- does this 90-day notice contain additional notices,

5    including debt collector notices and bankruptcy notices?

6    A.  Can you scroll down.  Yes.

7    Q.  Are you aware of how this -- whether this notice was

8    provided in multiple envelopes, in one envelope, or something

9    else?

10   A.  I don't know.

11   Q.  Who would have that knowledge?

12   A.  Our vendor, Covius Walz, would have mailed this document.

13   Q.  All right.  So you don't have knowledge of their mailing

14   practices?

15   A.  I know that we -- I know how the letters were generated and

16   that they mail the letters on our behalf.

17   Q.  You can answer my question.  So you don't know the mailing

18   practices of your lender -- vendor?  Of your vendor?

19   A.  I don't know the exact mailing practice for this

20   particular, if it was one envelope or not.  I would -- yeah.

21   Q.  I am going to look at Exhibit 13 here, which is the 30-day

22   demand letter admitted as Exhibit 13.  What is the last four

23   digits of the loan number here?

24   A.  2454.

25   Q.  Are you aware of whether -- let me -- are you aware of

M2sncitf                        Shulte - Redirect

1   whether this notice was contained in one envelope or two or

2   more than -- two or more envelopes?

3   A.   I don't know.

4   Q.   The same thing for Exhibit 12 here, which is the -- which

5   is admitted Exhibit 12.  Here is also the 30-day notice, 30-day

6   demand.  Are you aware of whether this was included, this

7   document with loan number ending in 2454 was included -- all

8   pages were included in one envelope or in multiple envelopes?

9   A.   Again, I don't know.

10          MR. GOMBERG:  Your Honor, one second just to review my

11  notes.

12  BY MR. GOMBERG:

13  Q.   Going back to the original note, let's say either of the

14  notes.  When you reviewed the notes, were there -- were there

15  any -- strike that.

16          MR. GOMBERG:  No further questions, your Honor.

17          THE COURT:  Thank you.

18          Ms. Nicholson, do you have any further questions?

19          MS. NICHOLSON:  Yes, your Honor.

20  REDIRECT EXAMINATION

21  BY MS. NICHOLSON:

22  Q.   Ms. Shulte, when looking at Plaintiff's Exhibit 1 --

23  actually, we have to --

24          MR. GOMBERG:  Do you want to switch?

25          MS. NICHOLSON:  Yes.

1              MR. GOMBERG:  Do I pause?

2              MS. NICHOLSON:  I think I have control.

3         Can you see my screen?

4              MR. GOMBERG:  Yes.

5              THE WITNESS:  Yes.  I see the list of exhibits, but I

6    don't see a document yet.

7              MS. NICHOLSON:  Okay.

8    Q.  Do you see this document?

9    A.  Yes.

10   Q.  Ms. Shulte, when this loan originated, who was it with?

11   A.  This was with IndyMac FSB.

12   Q.  And did IndyMac become OneWest?

13   A.  Yes.

14   Q.  And did OneWest become CIT?

15   A.  Yes.

16   Q.  Okay.

17   A.  Well, can I -- can I verify -- I mean clarify?  So in 2008,

18   the FDI -- IndyMac was seized, and the FDIC transferred certain

19   loans from IndyMac Bank to IndyMac Federal Bank.  And then in

20   2009, Indy -- FDIC transferred certain loans to the new entity,

21   OneWest Bank.  IndyMac did not really -- OneWest did not really

22   become IndyMac.  They purchased certain assets of --

23   Q.  They acquired --

24   A.  No, they didn't acquire it.  They purchased certain assets

25   of the failed IndyMac Bank, which was IndyMac Federal Bank.

1  Q.  Okay.  Is this one of those loans?

2  A.  Yes.

3  Q.  Okay.  And then OneWest merged with CIT, becoming CIT?

4  A.  Correct.

5  Q.  When did that happen?

6  A.  2015.

7  Q.  And would each entity have its own loan numbers?

8  A.  They -- no.  They all kept the same -- well, the IndyMac

9  Bank was the SBO number, which is here at the top of the loan

10 number --

11 Q.  Right?

12 A.  -- the top of the mortgage, 4183.

13 Q.  Okay.

14 A.  And then this CIT and OneWest number is what we saw on some

15 of the other documents.

16 Q.  Such as?  What about the notice, the 90-day notice, what is

17 that loan number?

18 A.  Yes.  That is the OneWest Bank CIT number.  OneWest Bank

19 and CIT numbers would be the same, which is ending in 2454.

20 Q.  Okay.  So those would be different than the IndyMac number

21 which is on the original note?

22 A.  Correct.

23 Q.  Okay.  And when you are looking at what has been admitted

24 as Plaintiff's Exhibit 9, the imaging screen here, when you

25 pull up the image of the original note in 2013 and 2007 that

1    were imaged in, did those contain the extra allonges and the

2    filled-in endorsement?

3    A.   The documents that I reviewed that are dated August 21,

4    2007, and May 7, 2013, and September -- December 9, 2019.  They

5    all are the original without the crossed-out endorsement.

6    Q.   Okay.  So the first time you saw the crossed-out

7    endorsement, the CIT put in the blank and then the additional

8    allonge, what was that -- it was imaged by the custodian on

9    what date?

10   A.   January 9, 2020.

11   Q.   Do you know why that happened?

12   A.   I was -- I was told by treasury that they update the

13   allonges when they have them in their possession, and they had

14   it in their possession for the possible loan sale.

15   Q.   So there was --

16   A.   The --

17   Q.   There was -- the loan was going to be sold.  Did that sale

18   fall through?

19   A.   Yes.

20   Q.   So has CIT been in possession of the original note since

21   commencement of the within foreclosure action?

22   A.   Yes.

23   Q.   At any time has the note been transferred to any other

24   entity while CIT has been in possession?

25   A.   No.

M2sncitf                          Shulte - Redirect

Q.   Other than transferring out to your attorney's office for
the purposes of this trial, has the note been in any other
entity's possession?

A.   I don't -- I don't know -- possible -- I don't know.
Possibly LoanCare.

Q.   Was it ever transferred to any other entity since it's been
in CIT's possession?

A.   No, I'm sorry.  It was not transferred to any other entity.

Q.   Has it always -- has CIT maintained possession, other than
for the purposes of trial, sending it to your attorney, has CIT
maintained possession?

A.   Yes.

          MS. NICHOLSON:  Thank you.  That's all.

          THE COURT:  All right.  Thank you.

          Mr. Gomberg, if you don't have any further questions
let's proceed with the next witness.

          Ms. Nicholson.

          MS. NICHOLSON:  Yes.  Ms. Shulte, you can leave the
meeting.

          THE WITNESS:  Okay.  Thank you.

          MS. NICHOLSON:  Thank you.

          MR. GOMBERG:  My client has been waiting, by the way,
to enter the meeting.

          MS. NICHOLSON:  Okay.

          THE COURT:  Ms. Nicholson, who is your next witness.

M2sncitf                         Neris – Direct

1              MS. NICHOLSON:  The next witness is Ramon Neris, and

2       I'm going to try to bring him into the meeting.

3              THE COURT:  Ms. Nicholson, just for the purpose of

4       timing.  What is your estimate of your questioning of

5       Mr. Neris?

6              MS. NICHOLSON:  No more than 15 minutes, your Honor.

7              THE COURT:  All right.

8              MS. NICHOLSON:  Plaintiff calls Ramon Neris.

9              Good morning, Mr. Neris.

10             Can you hear me?

11             THE COURT:  Mr. Neris, are you able to hear the

12      proceeding?

13             THE WITNESS:  Yes, I am now.

14             MS. NICHOLSON:  Okay.

15             THE COURT:  Before we proceed, there was a procedural

16      matter that we forgot to address.  When Ms. Shulte testified,

17      we did not put her under oath.  We will deal with that in a

18      moment, but let us ask Mr. Neris who take the oath.

19       RAMON NERIS,

20          called as a witness by the Plaintiff,

21          having been duly affirmed, testified as follows:

22      DIRECT EXAMINATION

23      BY MS. NICHOLSON:

24             MS. NICHOLSON:  Your Honor, should I contact

25      Ms. Shulte right now to sign back in?

1          THE COURT:  Yes, if you may.

2          MS. NICHOLSON:  Okay.  I will just do that really

3    quick before I -- I just sent her an e-mail.  Hopefully she

4    will sign back in.

5    BY MS. NICHOLSON:

6    Q.  Good morning, Mr. Neris.  How are you?

7    A.  Good morning, ma'am.  I'm fine.  Thank you for asking.

8    Q.  Can you state your address please.

9    A.  64 Clinton Place, Bronx, New York 10453.

10   Q.  And when you purchased this property, did you take out a

11   mortgage, Mr. Neris?

12   A.  Yes.

13   Q.  Okay.  If I show you -- I am going to share my screen now.

14   Bear with me one moment.  Mr. Neris, can you see the document

15   that is on my screen?

16   A.  I can see it, yes.

17   Q.  Is this the mortgage that you took out?

18   A.  Let me take a look.

19   Q.  Of $451,250 around August of 2007?

20   A.  I think that's -- I think that's what it is, but --

21   Q.  I'm sorry.  I couldn't hear you.

22   A.  Hold on one second.  Hold on.  I am not sure.  I don't

23   remember well.

24   Q.  Is this your signature, Mr. Neris?

25   A.  Yes.

M2sncitf                              Neris - Direct

1    Q.  And do you recall taking out a loan on the property when

2    you purchased it?

3    A.  Yes.

4    Q.  And did there come a point in time when you could no longer

5    make your monthly payments on that loan?

6    A.  I'm sorry.  Can you --

7    Q.  Did there come a point in time when you were no longer able

8    to make your monthly payments on that loan?

9    A.  Correct, yes.

10   Q.  Okay.  And do you remember entering into a modification on

11   the loan?

12   A.  I don't remember well, no.

13   Q.  Do you remember at any point in time signing what is up on

14   the screen now?  Can you see the document that's up there.  It

15   says Home Affordable Modification Agreement on top.

16   A.  No, I don't remember signing that.

17   Q.  Do you see it on the screen, sir?

18   A.  Yes, I do.

19   Q.  Do you remember at any point entering into an agreement to

20   make monthly payments for a reduced amount in or around 2017?

21   A.  No, I do not remember.

22   Q.  You don't remember.  The last page.  Is this your

23   signature, dated December 7, 2016?

24   A.  Yes, it is.

25   Q.  And do you recall when you -- do you recall a point in time

1   when you could no longer make payments on this modification?

2   A.  No, I do not remember exactly.

3   Q.  Have you been making mortgage payments?

4   A.  No, I haven't.

5   Q.  Do you know around when you stopped making those mortgage

6   payments?

7   A.  No, I do not remember.

8   Q.  But there was a point in time when you did stop making

9   those mortgage payments?  Was that a couple of years?  Two

10  years?  Three years?  Four years?

11  A.  Three -- to say a number I really don't have a clear memory

12  of it, but -- no, I cannot say it was like --

13  Q.  If I said that it was June of 2017, does that sound about

14  right?

15  A.  2017 you said?

16  Q.  June of 2017.

17  A.  No.

18  Q.  The trouble you had making the payments was around there?

19  Does that sound about right?

20  A.  No, I do not remember exactly, no.

21  Q.  But it has been more than one year?

22  A.  Yes.

23  Q.  Was it prior to the pandemic?

24  A.  Yes.

25  Q.  Okay.  So it's been a couple of years since you have made a

M2sncitf                    Neris - Direct

1   payment?

2   A.  I do not remember exactly.

3   Q.  Okay.  And now, I'm sorry, can you state your residence

4   again.  Your place of residence.

5           MR. GOMBERG:  Objection.  Asked --

6           THE COURT:  Sustained.  Asked and answered.

7           MS. NICHOLSON:  Okay.

8   BY MS. NICHOLSON:

9   Q.  64 Clinton Place, Bronx, New York, is that a residential

10  property?

11  A.  Yes.

12  Q.  Do you run a business out of that property?

13  A.  I run a ministry out of here.

14  Q.  And what is that ministry called?

15          MR. GOMBERG:  Objection.

16          THE COURT:  Mr. Gomberg?

17          MR. GOMBERG:  Yes.  I made an objection as to the

18  relevance.  This doesn't have to do with the payment of his

19  mortgage and default date.

20          MS. NICHOLSON:  It has to do with primary residence,

21  your Honor.

22          THE COURT:  It has to do with primary residence.  I

23  agree.  It also has to do with potential employment and sources

24  of income.

25          Overruled.

1   BY MS. NICHOLSON:

2   Q.  Mr. Neris, you can answer the question.

3   A.  Sorry.  What was the question again?

4   Q.  Do you run a business out of 64 Clinton Place, Bronx, New

5   York?

6   A.  A ministry, as I said.

7   Q.  What is the name of this ministry?

8   A.  Saved by the Holy Lamb Ministry.

9   Q.  And Saved by the Holy Lamb, how is that run out of the

10  property?  Is it -- how is it located?  Is there -- is it a

11  church?

12  A.  It is like a church.  Yes, it's a church.

13  Q.  It is a church?

14  A.  It's a small congregation.

15  Q.  Does that church meet at this location, 64 Clinton Place,

16  Bronx, New York?

17  A.  Yes.

18  Q.  Are there business offices there?

19  A.  There's no business office.

20  Q.  That business is run out of the -- is this a one-family

21  unit?

22  A.  Yes.

23  Q.  It is a one-family unit in a residential area?

24  A.  Yes.

25  Q.  And Saved by the Holy Lamb is located in this unit?

M2sncitf                        Neris - Cross

1   A.  Yes.

2   Q.  And you also reside in this unit?

3   A.  Yes.

4            MS. NICHOLSON:  Thank you.

5            No further questions.

6            THE COURT:  Mr. Gomberg?

7   CROSS EXAMINATION

8   BY MR. GOMBERG:

9   Q.  Mr. Neris, do you have any other residences that you live

10  at other than 64 Clinton Place?

11  A.  No.

12  Q.  Is that your primary residence?

13  A.  Yes.

14  Q.  And when you described the ministry being ran out of there,

15  do you have a business office for the -- this ministry that you

16  refer to?

17  A.  It is not an office.  It's just the people may come and

18  worship and pray.

19  Q.  Did you -- have you incorporated this company, this -- the

20  ministry in any sort of official manner?

21  A.  I registered it, yes.

22  Q.  It's registered.  I see.  And do you have anybody else that

23  lives at this, at your primary res -- at your residence?

24  A.  Yes, I do.

25  Q.  Yes.  Okay.  How many people live at your residence?

M2sncitf                        Neris - Cross

1    A.   There's two more people.

2    Q.   Got you.  Are they related to you?

3    A.   They are people that I help and that I met.  They needed

4    some help and I gave them help.

5              MR. GOMBERG:  Understood.

6              I have no more questions, your Honor.

7              THE COURT:  All right.  Thank you.  You may step down.

8    You're excused.  You may leave the proceeding.

9              Ms. Nicholson, next witness?

10             MS. NICHOLSON:  Your Honor, I am just going to check

11   to see if Ms. Shulte has come back.

12             THE COURT:  Okay.

13             MS. NICHOLSON:  She has.  I am going to admit her for

14   the purposes of being sworn in to --

15             Hi, Ms. Shulte.

16             THE COURT:  Ms. Shulte, we omitted a procedural matter

17   which is important prior to your testimony, which is to swear

18   you in as a witness to tell the truth.

19             You testified, and so I will ask whether you swear and

20   affirm that the testimony you gave to the Court and the parties

21   was the truth, the whole truth, and nothing but the truth.

22             THE WITNESS:  Yes.

23             THE COURT:  All right.

24             Mr. Gomberg, did you wish to in any way challenge the

25   taking of the oath after the fact?

1              MR. GOMBERG:  No, your Honor.

2              THE COURT:  All right.  Thank you for your testimony,

3    Ms. Shulte.

4              Ms. Nicholson.

5              MS. NICHOLSON:  Thank you.

6              Ms. Shulte, you can leave the room.

7              MR. NERIS:  I'm sorry.  May I leave?

8              THE COURT:  Yes, you may.  You're excused.

9              MR. NERIS:  Okay.  Thank you, your Honor.  Goodbye.

10             MS. NICHOLSON:  Ms. Shulte, you may leave the meeting

11   as well.

12             MS. SHULTE:  Thank you.

13             MS. NICHOLSON:  The plaintiff now calls Keith Nichols.

14   I am admitting him now to the meeting.

15             MR. GOMBERG:  Just a moment to grab a glass of water

16   before we swear him in?

17             Your Honor, is it all right if I grab a glass of water

18   before we swear him in?

19             THE COURT:  Yes.

20    KEITH NICHOLS,

21        called as a witness by the Plaintiff,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MS. NICHOLSON:

25   Q.  Good morning, Mr. Nichols.  How are you?

M2sncitf                         Nichols - Direct

1   A.  Good.  Thank you.  How are you?

2   Q.  Good.  Thank you.

3           Are you presently employed?

4   A.  Yes.

5   Q.  By whom are you employed?

6   A.  LoanCare LLC.

7   Q.  And how long have you been employed by LoanCare LLC?

8   A.  Since September 2019.

9   Q.  And prior to working for LoanCare LLC, did you work for any

10  other servicing entities?

11  A.  I did.

12  Q.  Who did you work for?

13  A.  Sure.  Bank of America National Association.

14  Q.  For how many years did you work for Bank of America?

15  A.  A little shy of ten years.

16  Q.  Okay.  What is your title with LoanCare?

17  A.  Litigation resolution specialist.

18  Q.  As a litigation resolution specialist, what are your daily

19  obligations and routines?

20  A.  Yeah, sure.  I'm assigned to a portfolio of contested

21  foreclosure matters mostly, work with assigned counsel to

22  provide information from systems, work toward case resolution,

23  and I'm authorized to give testimony in matters like today.

24  Q.  Okay.  Are you fully familiar with LoanCare's servicing

25  practices and procedures?

M2sncitf                          Nichols – Direct

1   A.  Yes.

2   Q.  Are you fully familiar with LoanCare's records and

3   recordkeeping systems?

4   A.  Yes.

5   Q.  What are those systems?

6   A.  Certainly.  There are a few.

7            The electronic system for day-to-day loan maintenance

8   is called MSP.

9            There is an image site which houses the images of the

10   loan-related documents.  That is called AIQ.

11            There is a system that kind of puts into -- excuse me,

12   a compilation the information from the MSP system.  That system

13   is called DLV.

14            And, lastly, there is a system used for the steps for

15   foreclosure, different attorney processes, communication

16   related to those types of matters, called LPS.

17   Q.  Did you receive training in these systems?

18   A.  I did.

19   Q.  And what did that training consist of?

20   A.  Sure.  There was a classroom, sitdown type teacher-led

21   training as well as side-by-side and just various on-the-day

22   job learning, trainings throughout the years.

23   Q.  Can you retroactively change anything in those systems that

24   you just mentioned?

25   A.  Not that I am aware, no.

M2sncitf                    Nichols - Direct

1   Q.  And can you retroactively add anything into those systems?

2   A.  The same.  Not that I am aware, no.

3   Q.  Can you delete any records or notes within those

4   recordkeeping systems?

5   A.  Cannot delete a previously made entry, no.

6   Q.  Okay.  I am going to show you the screen I am going to

7   share now.  Can you see the document that's on the screen right

8   now?

9   A.  At the moment, no.  I still see just the normal --

10  Q.  Can you see what is on the screen right now?

11  A.  I see the trial exhibit folder, no one particular exhibit

12  yet.

13  Q.  How about now?  What do you see on your screen?

14  A.  Yes.  I see the LoanCare screen print for the acquisition

15  of the -- of a loan.

16  Q.  Okay.  Now, what is LoanCare's relationship to CIT, the

17  plaintiff in this action?

18  A.  Sure.  LoanCare is the mortgage loan servicing -- servicer,

19  excuse me.

20  Q.  As the servicer, what are your duties and responsibilities?

21  A.  Sure.  It's kind of the day-to-day system, collecting

22  payments, customer service, tracking money that goes in,

23  tracking money that goes out, paying any types of escrow,

24  handling borrower communication.

25  Q.  Okay.  Now, can you identify the document that is on your

M2sncitf                          Nichols - Direct

1   screen?

2   A.  I can.  This is a copy of LoanCare's system of record as

3   relates to the promissory note for the subject mortgage here.

4   Q.  What system is this located in?

5   A.  Sure.  The MSP system.

6   Q.  And do you have access to this system?

7   A.  Yes, I do.

8   Q.  And who provided this screen shot?

9   A.  LoanCare.

10  Q.  Okay.  And is this screen maintained in the ordinary course

11  of LoanCare's business?

12  A.  Yes, it is.

13  Q.  And is this screen created in the ordinary course of

14  LoanCare's business?

15  A.  Yes.

16  Q.  And is this, the information in this screen created at or

17  near the information that it depicts occurred?

18  A.  Yes, it is.

19          MR. GOMBERG:  Objection, your Honor, which information

20  that it depicts?  Are you talking about the February of 2020

21  dates?  There's also an August 22, 2007, date.

22          MS. NICHOLSON:

23  BY MS. NICHOLSON:

24  Q.  Are each of the entries made at or near the time of

25  confirmation of the information in that screen?

M2sncitf                          Nichols - Direct

1    A.  Yes, they are.

2              MR. GOMBERG:  And the entry dates you are discussing

3    are the ones from 2020?  The ones on the left-hand side of the

4    printout -- of the screen?

5              THE COURT:  Mr. Gomberg, Ms. Nicholson is conducting

6    the examination.  If you have a question, ask the question to

7    her not, to the witness.

8              MR. GOMBERG:  That's exactly who I was asking.  I was

9    asking Ms. Nicholson just to clarify --

10             THE COURT:  Ms. Nicholson, will you clarify.

11             MS. NICHOLSON:  Certainly.  I can clarify with the

12   witness.

13   BY MS. NICHOLSON:

14   Q.  Is each entry made at or near the time that the information

15   is obtained?

16   A.  They are, yes.

17   Q.  Those would be the dates on the left-hand side.  Is the

18   information in this document input by someone with firsthand

19   knowledge of the event or transaction it depicts?

20   A.  Yes.

21   Q.  And is the information in this screen shot input by

22   somebody with a duty to report honestly and accurately within

23   the recordkeeping system?

24   A.  Yes.

25   Q.  Okay.  And is this a true and accurate copy of the

M2sncitf                        Nichols - Direct

1   electronic record as it is maintained in LoanCare's system?

2   A.  Yes, it is.

3   Q.  Could you pull up this screen shot today in MSP?

4   A.  Yes.

5          MS. NICHOLSON:  Okay.  At this point in time I would

6   like to have admitted into evidence what has been marked as

7   Plaintiff's Exhibit 17.

8          MR. GOMBERG:  Note my objection, your Honor, please.

9          THE COURT:  Admitted.  Objection noted.

10          (Plaintiff's Exhibit 17 received in evidence)

11   BY MS. NICHOLSON:

12   Q.  Now, Mr. Nichols, what information is contained within this

13   screen shot?

14   A.  Certainly.  It is the location and deposit date of the

15   promissory note for the subject property mortgage.

16   Q.  When you say deposit note -- excuse me, deposit date, what

17   does that mean?

18   A.  Sure.  That's just the terminology used to show when it was

19   physically placed into a vault.

20   Q.  And who is the custodian?

21   A.  Certainly.  It is Deutsche Bank National Trust Company.

22   Q.  On behalf of whom?

23   A.  On behalf of the plaintiff, CIT Bank.

24   Q.  Okay.  And what is the deposit date, the date that it was

25   placed into default?  Into the vault rather.  Sorry.

M2sncitf                          Nichols - Direct

1   A.   Certainly.  August 22, 2007.

2   Q.   And who provided this information?

3   A.   LoanCare provided the screen shot, yes.

4   Q.   Thank you.  Now I am going to pull up on to the screen what

5   has been admitted into evidence as Plaintiff's Exhibit 14.

6           Do you recognize this document?

7   A.   I do.

8   Q.   What do you recognize it to be?

9   A.   Sure.  This is a printout from a system called Track Right,

10  which basically, you know, captures and records the mailings

11  for the subject mortgage.

12  Q.   Okay.  And I am going to show you what has been marked as

13  Plaintiff's Exhibit -- let me see here what we've got.

14          Exhibit 10.

15  A.   I'm sorry.

16  Q.   Mr. Nichols, do you recognize this document?  It's been

17  admitted into evidence as Plaintiff's Exhibit 10.

18  A.   Yes, I do.

19  Q.   What is it?

20  A.   So that is a copy of one of the letters that looks like the

21  New York 90-day letter, yes.

22  Q.   Okay.  Are you familiar with the mailing practices and

23  procedures of Covius, formerly known as Walz?

24  A.   Yes.

25  Q.   What is the relationship between the servicer and Covius

M2sncitf                        Nichols - Direct

1   Walz when it comes to mailing of notices?

2   A.   Certainly.  They are the third-party vendor to handle the

3   actual physical mailing -- excuse me, the printing and placing

4   of the letters to be mailed for the servicer.

5   Q.   Did you receive any training from Walz or Covius, formerly

6   known as Walz?

7   A.   Yes, I did.

8   Q.   When was that training?

9   A.   Sure.  It was December of 2021.

10   Q.   Okay.  And during that training, did they advise you that

11   their practices had changed over time, or have they always

12   remained the same?

13   A.   They have been the same and consistent since at least 2011.

14   Q.   Okay.  Looking at this notice, was this notice mailed in

15   one envelope?

16   A.   Yes.

17   Q.   How do you know that?

18   A.   The entry is returned and captured on Track Right in one

19   PDF form, and that is the practice as far as, you know, getting

20   the mailing to them, to send in one envelope.

21   Q.   How do you know that each page in this PDF was in one

22   envelope for mailing?

23   A.   Sure.  So there's a small bar code or RFID on the lower

24   left-hand corner of some of the pages.  And then also the fact

25   that it is on that Track Right and in this format, like, so,

1     after it's mailed, it's scanned and returned to show basically

2     three ways that every page has been sent.

3     Q.  So would each of these pages exist if they had not been in

4     the envelope?

5     A.  In the PDF form, no.

6     Q.  Okay.  And is that true for Plaintiff's Exhibits 11, 12, 13

7     and 14?  I'll show each of them to you in turn.

8               So this is 11.  They each have -- what did you refer

9     to it as a code?

10    A.  I believe like -- RFID, radio frequency identification,

11    RFID code.  I believe that's what it is called.

12    Q.  And is that what this is here in the left-hand corner?

13    A.  Yes.

14    Q.  And that code wouldn't exist if all of those pages hadn't

15    been mailed in that one envelope?

16    A.  That's my understanding, yes.  So that was the first-class

17    mailing of the 90-day, correct?

18    Q.  Yes.

19    A.  Excellent.

20    Q.  And then do you recognize this document?

21    A.  I do.

22    Q.  What do you recognize it to be?

23    A.  It appears to be the certified mail copy of the notice of

24    intent to accelerate, or the breach letter.

25    Q.  And would this have been mailed the same way, by Covius,

M2sncitf                     Nichols - Direct

1  formerly known as Walz?

2  A.  The mailing practice would be the same, yes.

3  Q.  And so were all of these pages included in one envelope?

4  A.  Again, that's my understanding of how they come back, yes.

5  Q.  What about this?  Exhibit 13?  What is this document?

6  A.  13, the first-class mailing of the same notice of intent to

7  accelerate, or breach letter.

8  Q.  And does it have the same code box on it?

9  A.  It has a code or a box.  I'm not sure if it's the same, but

10  again, the --

11  Q.  But it is for the same purpose.  I mean, not the exact

12  same --

13  A.  Yes, purpose.  Yes, excuse me.  I misunderstood.

14  Q.  Would all of the pages in this PDF have been mailed in one

15  envelope?

16  A.  Yes.  That's my understanding.

17  Q.  Okay.  Now, when you received your training with Walz

18  Covius, can you walk us through what that mailing procedure

19  looks like?

20  A.  Sure.  This was conducted virtually.  And it showed the

21  facility in the, you know, either picture form -- basically

22  where -- we were visually able to see the machines and kind of,

23  you know, where it starts and what -- and, you know, where it

24  ends, which is basically is a machine to a bin, right?

25         So the encrypted messages are sent -- the encrypted

1  information, excuse me, is sent, turned into a letter.  It's

2  physically mailed and placed into a bin.

3  Q.  Okay.  And you saw all of that happen?

4  A.  Again, it was more or less pictures of, you know, the

5  different events, you know, in a virtual environment.  That's

6  kind of the best that they had at the time.

7  Q.  Okay.  And, Mr. Nichols, did you -- how is the data

8  provided to Walz -- Covius, formerly known as Walz?

9  A.  Sure.  Electronically encrypted.

10  Q.  By whom?

11  A.  The servicer.

12  Q.  Okay.  So the encrypted information is provided by the

13  servicer, and then what happens?

14  A.  Certainly.  Walz has a template preapproved by that

15  particular servicer for the different mailings, and it -- the

16  information is then extracted from the individual loan into the

17  form.

18  Q.  Okay.  And what happens after it's put into that template?

19  A.  I'm sorry.  I lost you a little bit.  Would you mind

20  repeating the question, please.

21  Q.  Sure.  After it's put into that template, what happens

22  next?

23  A.  Sure.  The physical printing of the letter, to be placed

24  into an envelope, and then into a bin to be mailed.

25  Q.  So it's placed directly into an envelope and then into a

1    bin to be mailed?

2    A.   That's my understanding of the process, yes.

3    Q.   And then what happens after all of that occurs?  Once it is

4    mailed, what does Walz Covius do?

5    A.   Certainly.  The return images are sent back to the

6    servicer, again, kind of like what I testified before, to show

7    proof that they were mailed, also placed into that Track Right

8    system to kind of track and -- to track, yeah, the mailing of

9    the letters.

10   Q.   Now, would these PDFs -- there are 11, 12, 13 and 14 --

11   would they exist in the format that we see if they had not been

12   mailed?

13   A.   It's my understanding, no.  That would not happen.

14   Q.   Okay.  And would these notices, each one have been mailed

15   in their entirety in one envelope, individually?  So, 13 -- 11

16   in one envelope, 12 in one envelope, 13 in one envelope, 14 in

17   one envelope?

18   A.   Yes.

19   Q.   And they would contain all the information in the PDF

20   according to the practices and procedures of Walz Covius?

21   A.   Yes.  That's correct.

22   Q.   Thank you.

23        I am going to show you what's been marked as

24   Plaintiff's Exhibit 18 for identification purposes.

25        Do you recognize this document?

1  A.  I do.

2  Q.  What do you recognize it to be?

3  A.  This is a copy of the account history or payment history

4  for the subject mortgage loan.

5  Q.  And is this payment history created by LoanCare?

6  A.  The page I'm staring at, yes.

7  Q.  Let me just scroll through.

8          Is this document maintained in the ordinary course of

9  LoanCare's business?

10  A.  Yes, it is.

11  Q.  And is this document -- is each entry in this document

12  created at or near the time of the event or transaction it

13  purports to depict?

14  A.  Yes.

15  Q.  What are the transactions that it depicts?

16  A.  Certainly.  Some of them are, you know, payments, late

17  payments, escrow advances, corporate advances, just to name a

18  few, but the descriptions are pretty well defined in this

19  product -- yes, they are.

20  Q.  Okay.  Now, is this document maintained in LoanCare's

21  records?

22  A.  Yes, it is.

23  Q.  Where is it maintained?

24  A.  Certainly.  It is maintained in the DLV system as well as

25  the AIQ image system.

M2sncitf                    Nichols – Direct

```
1   Q.  And are the entries into this account history made by
2   somebody with firsthand knowledge of each entry as it is made?
3   A.  Yes, they are.
4   Q.  And are the entries in this document created by somebody
5   with a duty to report honestly and accurately within the
6   recordkeeping system?
7   A.  Yes.
8           MR. GOMBERG:  Objection, your Honor.
9           How does he know this?
10          THE COURT:  Ms. Nicholson, would you lay the
11  foundation for the question.
12          MS. NICHOLSON:  I'm sorry, your Honor.
13  BY MS. NICHOLSON:
14  Q.  Each entry –– Mr. Nichols, is each entry into an account
15  history made by an employee of LoanCare?
16  A.  Yes.
17  Q.  And is that employee –– does that employee have a duty to
18  report honestly and accurately within LoanCare's recordkeeping
19  system?
20  A.  Yes.
21  Q.  And is this a true and accurate copy of the account history
22  as it is maintained by LoanCare?
23  A.  It is, yes.
24  Q.  Can you access this account history currently in your
25  system?
```

M2sncitf                          Nichols – Direct

A.  Yes.

Q.  And have you previously reviewed this account history in

relation to this loan?

A.  Yes, I have.

Q.  And who provided this account history?

A.  LoanCare did.

        MS. NICHOLSON:  At this point in time I would like to

admit as a business record into evidence what has been marked

as Plaintiff's Exhibit 18.

        MR. GOMBERG:  Objection.  Lack of foundation.

        THE COURT:  Overruled.  The exhibit is admitted.

        (Plaintiff's Exhibit 18 received in evidence)

        MS. NICHOLSON:  Thank you.

BY MS. NICHOLSON:

Q.  Mr. Nichols, how do you know that this account history

relates to this loan?

A.  Certainly.  The identifying marks in the upper left-hand

corner, as well as the top side, right?  So it's the account

number for the subject mortgage loan as well as the borrower

name, property address.

Q.  Okay.  And is LoanCare's account or loan number different

from CIT's loan number?

A.  I believe it is, yes.

Q.  Okay.  Now, when you are looking at this document, what is

the borrower's name?

1    A.  Certainly.  Ramon Neris.

2    Q.  And what is the default date?  At what point did the loan

3    go into default?

4    A.  Certainly.

5          MR. GOMBERG:  Objection.  Your Honor, what is his

6    basis for that knowledge?

7          MS. NICHOLSON:  That's what he's going to testify to

8    right now.

9          MR. GOMBERG:  He's going to testify as to the answer,

10   but not as the basis of what he knows and how he knows it to

11   be.

12         MS. NICHOLSON:  From the document.

13         THE COURT:  The document has been admitted, and the

14   document presumably is the basis for his knowledge.

15         MR. GOMBERG:  Let's see what it says on the document.

16   Q.  Mr. Nichols, what is the default date on this loan?

17   A.  Certainly.  If you wouldn't mind scrolling down to, I think

18   it's -- one more page, please.  I will just double check and

19   verify.  You can stop right about there, I believe.  So the

20   payment is due for June 1, 2017.

21   Q.  How do you know that?

22   A.  Certainly.  I believe it says it at the top of the screen

23   now that I think of it, but I was also looking for the last

24   made payment, which was May 15, 2017, which shows, after credit

25   of the same, that the account is not due for 6/1/2017.  My

1    apologies for the scrolling through the pages there.

2    Q.  No, no.  That's -- so there's -- it's within the account

3    history itself as well as on that first page it states it?

4    A.  If you look at the very top, and I apologize for not going

5    there in the first place, it is the third box down on the left,

6    due date 6/1/2017.

7    Q.  Okay.  And after that point in time monthly payments were

8    no longer being received?

9    A.  That is correct.

10   Q.  Thank you.  Mr. Nichols, can you identify this document?

11   A.  I can.  It's a copy of the -- it is labeled as a payoff,

12   paydown quote information, but it's basically the judgment

13   figures used for -- to calculate the amounts due and owing.

14   Q.  Okay.  And is this document created in the ordinary course

15   of LoanCare's business?

16   A.  Yes, it is.

17   Q.  And what is the purpose of this document?

18   A.  To provide the figures needed for the judgment, to prepare

19   the judgment figures.

20   Q.  Is it used for any other purpose?

21   A.  It could be used if a borrower were to request a payoff of

22   the mortgage loan.  That would be another use.

23   Q.  And is this document maintained in the ordinary course of

24   LoanCare's business?

25   A.  Yes, it is.

1    Q.  And where is it maintained?

2    A.  Certainly.  In the DLV system as well as the AIQ system.

3    Q.  And if you pulled up the loan in your system today, could

4    you pull up this record?

5    A.  Yes, I could.

6    Q.  And is the information contained within this document

7    created by somebody with firsthand knowledge of what is due and

8    owing?

9    A.  Yes.

10   Q.  And is this document created by somebody with a duty to

11   report honestly and accurately within the recordkeeping system

12   at LoanCare?

13   A.  Yes.

14   Q.  And is this a true and accurate copy of the electronic

15   record as it is maintained by LoanCare in the two systems you

16   referred to?

17   A.  Yes.

18   Q.  So, if you pulled up this record, it would look exactly

19   like this in your system today?

20   A.  Yes.  That would be correct.

21          MS. NICHOLSON:  At this point in time I would like to

22   move into evidence what has been marked as Plaintiff's Exhibit

23   19 as a business record.

24          MR. GOMBERG:  Objection, your Honor.

25          MS. NICHOLSON:  I'm sorry.  I couldn't hear you.

M2sncitf                    Nichols – Direct

1          MR. GOMBERG:  Objection, your Honor.

2          THE COURT:  What is the nature of your objection?

3          MR. GOMBERG:  Lack of foundation to describe this

4    document.  Unless the witness is being introduced as an expert

5    as to these documents, he does not sufficiently state his

6    personal knowledge of having -- of anybody else inputting any

7    data into it, and it does not meet the business record

8    exception.

9          MS. NICHOLSON:  He does not have to have personal

10   knowledge for a business record.  That's the entire point of a

11   business record, is that it is a record maintained by the

12   business, created, maintained, and entered by somebody with a

13   duty to report honestly and accurately.  Each business record

14   would not have been input by Mr. Nichols himself.

15         THE COURT:  I'm sorry.  Admitted.

16         The objection has been noted.

17         (Plaintiff's Exhibit 19 received in evidence)

18         MR. GOMBERG:  Is it overruled?

19         THE COURT:  Objection overruled.

20         The document is admitted.

21         MS. NICHOLSON:  Thank you.

22   BY MS. NICHOLSON:

23   Q.  Mr. Nichols, do you know what this document -- how do you

24   know that it relates to this loan?

25   A.  Again, the loan number as well as the other identifying

M2sncitf                     Nichols - Direct

```
 1    information at the top in the box, borrower name, property
 2    address.
 3    Q.   What is the borrower's name?
 4    A.   Certainly.  Ramon Neris.
 5    Q.   And the property address?
 6    A.   64 Clinton Place, Bronx, New York 10453.
 7    Q.   And is this default date on this document?
 8    A.   Yes, it is.
 9    Q.   What is that default date?
10    A.   6/1/2017.
11    Q.   And what is the total principal balance due and owing?
12    A.   Certainly.  $613,452.36.
13    Q.   What is the total interest amount due and owing?
14    A.   Interest $62,042.85.
15    Q.   And that was calculated at what interest rate?
16    A.   Certainly.  It is 3 percent.
17    Q.   How much was -- is due and owing for escrow advances?
18    A.   $38,452.64.
19    Q.   And what are the escrow advances?
20    A.   Certainly.  Homeowner's insurance and property taxes that
21    have been advanced on behalf of the property.
22    Q.   Thank you.  I am now going to show what has been marked for
23    identification purposes as Plaintiff's Exhibit 20.
24         Mr. Nichols, do you recognize this screen?
25    A.   Yes, I do.
```

M2sncitf                         Nichols - Direct

1    Q.   What do you recognize it to be?

2    A.   Certainly.  So this is the screen print of the day-to-day

3    mortgage loan servicing system record, the MSP system.  So this

4    is a business record screen shot -- excuse me -- of that, that

5    system for this particular mortgage, mortgage loan.

6    Q.   Is this screen created in the ordinary course of LoanCare's

7    business?

8    A.   Yes, it is.

9    Q.   And is this screen maintained in the ordinary course of

10   LoanCare's business?

11   A.   Yes.

12   Q.   And if you went into the system today, is this a true and

13   accurate copy of the electronic record as it is maintained?

14   A.   It would be correct and the same, yes.

15   Q.   And is this doc -- is the information in this document

16   input by somebody with a duty to report honestly and accurately

17   within the recordkeeping system at LoanCare?

18   A.   Yes.

19   Q.   Is the information that is in this screen shot input with

20   somebody with firsthand knowledge of the amounts that are due

21   and owing on this loan?

22   A.   Yes.

23   Q.   And who provided this screen shot?

24   A.   LoanCare LLC.

25           MS. NICHOLSON:  At this point in time I would like to

move into evidence what has been marked as Plaintiff's Exhibit
20?

       THE COURT:  Mr. Gomberg.

       MR. GOMBERG:  Note my objection.

       THE COURT:  Objection overruled.

       The document is admitted.

       (Plaintiff's Exhibit 20 received in evidence)

BY MS. NICHOLSON:

Q.  Mr. Nichols, looking at this screen shot, how do you know
that it relates to this loan?

A.  Borrower name and loan number.

Q.  And where are those located?

A.  Certainly.  Upper left-hand corner.

Q.  And what is the principal balance due and owing?

A.  Certainly.  It's $613,452.36.

Q.  And the amount of the interest?

A.  $62,042.85.

Q.  What is the interest -- what are the dates the interest
runs from and to?

A.  Certainly.  From May 1, 2017, to today's date, February 28,
2022.

Q.  At an interest rate of what?

A.  3 percent.

Q.  What is the escrow advance for this loan?

A.  $38,452.64.

M2sncitf                         Nichols - Direct

1    Q.  Thank you.  Mr. Nichols, can you identify this document?

2    A.  Yes, I can.

3    Q.  -- that's been marked as Plaintiff's Exhibit 21?

4    A.  I'm sorry.  Yes, I can.

5    Q.  What can you identify it to be?

6    A.  Certainly.  Similarly to the last exhibit, this is a screen

7    print of LoanCare's mortgage servicing system of record, the

8    day-to-day system, MSP.  This is capturing the fees and the per

9    diem interest for the subject mortgage loan.

10   Q.  Is this screen shot created in the ordinary course of

11   LoanCare's business?

12   A.  Yes.

13   Q.  And is this screen shot maintained in the ordinary course

14   of LoanCare's business?

15   A.  It is, yes.

16   Q.  And is this information in this exhibit -- or, sorry, in

17   this business record, is it input by somebody with a duty to

18   report honestly and accurately within the recordkeeping system?

19   A.  Yes.

20   Q.  And is it created by somebody with firsthand knowledge of

21   the figures that are in this screen shot?

22   A.  Yes.

23   Q.  And is this a true and accurate copy of the electronic

24   record as it is maintained by LoanCare?

25   A.  Yes, it is.

1          MS. NICHOLSON:  At this point in time I would like to

2   move into evidence what has been marked as Plaintiff's Exhibit

3   21?

4          MR. GOMBERG:  Objection.

5          THE COURT:  Mr. Gomberg?

6          MR. GOMBERG:  Objection.

7          THE COURT:  Objection overruled.

8          The document is admitted.

9          (Plaintiff's Exhibit 21 received in evidence)

10   BY MS. NICHOLSON:

11   Q.  Mr. Nichols, looking at this screen shot, how do you know

12   it relates to this loan?

13   A.  The loan number in the upper left-hand conner.

14   Q.  Is that LoanCare's number?

15   A.  Yes, it is.

16   Q.  Okay.  What is the per diem interest rate on this loan?

17   A.  Certainly.  The amount is $35.24.

18   Q.  That's based on an interest rate of what?

19   A.  3 percent.

20          MS. NICHOLSON:  Thank you.

21          No further questions, your Honor.

22          THE COURT:  Mr. Gomberg?

23          MR. GOMBERG:  If Ms. Nicholson can share the ability

24   to share the screen.

25          MS. NICHOLSON:  Oh, yes.  Sorry.

1              You should be able to now.

2     CROSS EXAMINATION

3     BY MR. GOMBERG:

4     Q.  Mr. Nichols, do you see my screen here showing you Exhibit

5     17?

6     A.  Yes.

7     Q.  Taking a look at Exhibit 17, do you see any entries prior

8     to February 14, 2020?

9     A.  I'm sorry.  The connection broke just a little bit.  Do you

10    mind asking the question again, please, sir.

11    Q.  Sure.  When looking at Exhibit 17 -- can you hear me all

12    right?

13    A.  Yes, now I can.  Thank you.

14    Q.  Quite all right.  When looking at Exhibit 17 in front of

15    you here, do you see any entries prior to February 14, 2020?

16    A.  Yes.

17    Q.  Where do you see the prior entries?

18    A.  There is a prior entry noted February 13, 2020.

19    Q.  Absolutely.  Do you see any entries noted prior to February

20    13, 2020?

21    A.  I do not.

22    Q.  All right.  Are there additional documents that would show

23    entries on this program on this printout continuation that

24    would be prior to the February 13, 2020?

25    A.  I do not know.

M2sncitf                      Nichols - Cross

Q.   The February 13, 2020, notation, it's -- can you please

just read for the record what it says.

A.   Certainly.   It says, "Please provide date CIT took

possession of the note."

Q.   And the notation to the left of that is MDA.   Is that who

made the input?   That would be the initial?

A.   That's correct.

Q.   So is it fair to say that the notation, the input on

February 14, 2020, was not made at the time of the deposit date

of the note?

A.   I don't understand the question.   Sorry, sir.

Q.   Sure.   The deposit date listed on February 14, on the

notation of February 14, 2020, it says deposit date August 22,

2007, is that correct?

A.   The February 14, 2020, notation states that the deposit --

yes.   The one on the 14th states that the deposit date was

8/22/2007.

Q.   Right.   So that notation was made on February 14, 2020,

correct?

A.   That's what this system captures and communicates, yes.

Q.   Are there any prior notations that would show a deposit

date made at or around the time of the alleged August 22

deposit date -- August 22, 2007, deposit date?

A.   I do not know.

Q.   You stated there is a loan number that is included on this

M2sncitf                          Nichols – Cross

1   printout?

2   A.   There is a loan number.   Upper left-hand corner, yes, sir.

3   Q.   Is that the loan number ending in 3903?

4   A.   Yes, sir.

5   Q.   Are you aware of any –– is that the loan number used by CIT

6   Bank LoanCare?   Somebody else?

7   A.   This is the LoanCare loan number.

8   Q.   And when LoanCare provides for any notices, is this the

9   loan number that would be used to note the loan number?

10  A.   I am not sure I understand that question.   Do you mind

11  repeating it, please.

12  Q.   Sure.   You previously stated that you are aware of the

13  mailing practices and procedures for LoanCare, correct?

14  A.   LoanCare through the third-party vendor Walz, whom CIT Bank

15  used, yes.

16  Q.   Right.   So my question is, is this loan number the loan

17  number that's used when the –– as you previously said,

18  encrypted message sent from LoanCare to the third-party

19  servicer, including the information which is then transcribed

20  into the third-party service, subservicer to create their

21  notices, is this the loan number that is used to –– when

22  sending those encrypted messages, regarding this loan?

23  A.   By –– if you're saying by LoanCare LLC, yes.

24  Q.   And does not –– who sends information regarding loans to

25  the subservicer for creation of any notices regarding this,

1   this mortgage?

2   A.   Maybe I am misunderstanding your question.  You are asking

3   who sends information to the subservicer?  I'm sorry.  Would

4   you mind rephrasing, please, sir?

5   Q.   Sure.  Absolutely.  As a reminder, your position, is -- you

6   are employed by LoanCare, is that correct?

7   A.   Yes, sir.

8   Q.   And what is your position?  Your title?

9   A.   Certainly.  Litigation resolution specialist.

10  Q.   And I -- maybe this was asked before.  If it was, I

11  apologize.  But can you at least -- specify what your duties

12  were and what your -- what your duties are as litigation

13  specialist?

14  A.   Yes, I can.  Again, assigned to a portfolio of contested

15  foreclosure matters, you know, work with counsel to provide

16  information needed to basically, you know, prosecute the

17  foreclosure.  I'm also authorized to give testimony, you know,

18  as a corporate representative for today.

19  Q.   So, as part of litigating a foreclosure matter, there are

20  condition precedent notices that are required, is that correct?

21  A.   Yes.

22  Q.   Such as the 90-day notice, the 30-day notice, is that

23  right?

24  A.   In the state of New York that's my understanding, yes.

25  Q.   All right.  So my question going back to the loan number

M2sncitf                         Nichols - Cross

is, whether this is the loan number that is provided from

LoanCare to -- who I believe you noted as the subservicer for

creation of these notices with regards to potential litigation?

A.  I don't remember saying subservicer before.  If I had,

LoanCare is the subservicer for, you know, this mortgage loan,

this CIT Bank plaintiff loan.

Information sent from LoanCare as the servicer at the

time LoanCare is servicing the loan would contain the loan

number that you see in the upper left-hand corner.  Hopefully

that answers what you are asking.

Q.  Yeah.  My apologies on the subservicer language.  Can you

remind me, the company that I guess LoanCare hires to do its

mailings, what is the name of that, so I can refer to it?

A.  Certainly.  It is known as Covius, formerly Walz, W-a-l-z.

Q.  So just to clarify, when -- does LoanCare provide

information --

MS. NICHOLSON:  Objection.  Relevance.  The mailings

were done by CIT as was previously testified not by LoanCare.

THE COURT:  Mr. Gomberg, I'm failing to see the

relevance and the purpose and materiality of this line of

questioning.

MR. GOMBERG:  Then I will ask this, if that's the

case.

BY MR. GOMBERG:

Q.  Mr. Nichols, do you have -- you previously stated that you

M2sncitf                    Nichols - Cross

1    have information about the mailing practices, that you are

2    aware of the mailing practices and procedures of Covius,

3    formerly known as Walz, is that correct?

4    A.  I have been trained on that, yes.

5    Q.  Well, what is your -- but you have not been trained as to

6    CIT Bank's mailing practices and procedures, is that correct?

7    A.  It is my understanding that mailing practices and

8    procedures of Covius Walz incorporates other servicers, one of

9    which being CIT Bank and, therefore, the training is basically

10   the same or -- it is the same I am told.  Excuse me.  It is my

11   understanding that it is the same based off of that.  Excuse

12   me.

13   Q.  Have you taken any -- have you received any training as to

14   CIT Bank's mailing practices and procedures?  Any classes?

15   A.  Again, as so far as they have used Walz, they are the same.

16   It is my understanding that they are the same.

17          MR. GOMBERG:  So if that is the case, your Honor, my

18   line of questioning is to request what information was being

19   input by Covius, formerly Walz, and what loan number was used

20   for them to create their notices, whether it was this notice,

21   this loan number that we are seeing at the top left of the

22   screen or something else.

23          THE COURT:  Again, Mr. Gomberg, what relevance, what

24   importance and materiality does the answer to that question

25   have to the issues that are at stake in this litigation?

M2sncitf                    Nichols - Cross

1          MR. GOMBERG:  Sure.

2          So one the requirements pursuant to the 90-day notice,

3     the 1304, RPAPL 1304 is to provide knowledge of mailing

4     practices and procedures to prove that the notices, the 90-day

5     notice, the condition precedent notice, the 30-day notice were

6     mailed, that they were actually mailed by the first-class

7     mailing as well as certified mailing.

8          If the mailings that are done do not include

9     information that is relevant to the loan necessarily -- in

10    other words, a completely different loan number is included on

11    the 90-day notice, on the 30-day notice, that does not provide

12    notice to the borrower.

13         So I am trying to attempt to figure out which loan

14    number is used from which of these, servicer to subservicer to

15    Covius, formerly known as Walz, to provide the notations that

16    are included in the 90-day notice and the 30-day notice.

17         MS. NICHOLSON:  Notices were mailed by CIT, not

18    LoanCare.  The prior witness testified to the fact that the

19    notices were done prior to LoanCare becoming the subservicer.

20         Ms. Shulte testified to the mailing practices and

21    procedures of CIT, identified their loan number on the

22    documents, and Mr. Nichols has only testified as to the Walz

23    Covius mailing practices and procedures.

24         MR. GOMBERG:  You are saying that they are the same,

25    that they used Covius, formerly known as Walz, to mail the

M2sncitf                       Nichols - Cross

1  notices that CIT Bank provides the information for?

2          MS. NICHOLSON:  That's what the previous witness

3  testified to, that CIT provides the information, and then

4  Mr. Nichols testified to what happens once Walz Covius gets the

5  information.

6          MR. GOMBERG:  So now I am trying to figure -- just to

7  confirm whether the witness will tell me the same thing,

8  because these loan numbers do not match up, as is clearly seen.

9          MS. NICHOLSON:  Again, the notices, when they were

10 mailed, the servicing is with CIT, as was already testified to.

11         MR. GOMBERG:  But the mailings were done by Covius,

12 formerly known as Walz.

13         MS. NICHOLSON:  As vendor for CIT, not vendor for

14 LoanCare.

15         MR. GOMBERG:  So then --

16         THE COURT:  Mr. Gomberg, I am going to --

17         MR. GOMBERG:  -- he can answer the question.

18         THE COURT:  Mr. Gomberg, I am going to rule that this

19 has been asked and answered.

20         Proceed.

21         THE COURT:  Ms. Nicholson?

22         MS. NICHOLSON:  Yes.

23         THE COURT:  Anything else?

24         MR. GOMBERG:  I'm sor --

25         MS. NICHOLSON:  Not from me, your Honor.

M2sncitf                    Nichols - Cross

1              MR. GOMBERG:  I am almost done, your Honor.

2              THE COURT:  Mr. Gomberg.

3              MR. GOMBERG:  I'm almost done, your Honor.  I was just

4      reviewing the count here.

5      BY MR. GOMBERG:

6      Q.  Mr. Nichols, are there any notations of any other loan

7      numbers on any of the documents that you reviewed for us today,

8      including Exhibit 17, Exhibit 18, Exhibit 19, Exhibit 20 and

9      Exhibit 21, is there any other loan number other than the loan

10     number ending in 3903 included in any of these documents?  You

11     can direct me to show you any of the documents that you -- as

12     you request?

13     A.  No problem.  I do not recall seeing another loan number on

14     those exhibits that you have mentioned, no.

15     Q.  You previously noted something about a breach letter.  Can

16     you clarify what a breach letter is.  I just need you to

17     clarify whether it is a 90-day or 30-day or something -- or

18     something else?

19     A.  Certainly.  I apologize if I didn't make it clear.  Usually

20     in my testimony I would say that it is a notice of intent to

21     accelerate, or commonly known a breach letter.  Excuse me if

22     that was not communicated before.  My apology.

23     Q.  What we're looking at here is Exhibit 13.  Which of the

24     notices is this?  You can direct me to go up or down or

25     anything?

M2sncitf                    Nichols - Cross

1   A.  This is not the New York 90-day letter.  So this is the

2   letter sent out pursuant to the mortgage for -- concerning

3   intent of acceleration.

4   Q.  So -- so it is a 30-day notice, the 30-day default notice?

5   A.  Again, I wanted to refrain from any commonly used frame --

6   terms to avoid questions like the one before with the breach.

7   So -- but, yes, all those would be kind of in that bucket, yes.

8   Q.  All right.  Understood.  This loan number that's seen as

9   Exhibit 13, do you -- have you seen that loan number before?

10  A.  I have.

11  Q.  Where did you see that loan number?

12  A.  In preparation for, you know, today's appearance, looking

13  at these documents, the prior servicer, right?

14  Q.  Well, you tell me.  Where did you see this loan number?

15  A.  I'm sorry.  From the prior servicer.  The "right" was not

16  supposed to be there.  I apologize, sir, and your Honor.

17  Q.  From CIT Bank or somebody else?

18  A.  CIT bank.

19  Q.  Do you know what document you may have seen this loan

20  number on in your preparation for today's testimony?

21  A.  I wasn't honing in on it, but I did notice that there was a

22  difference, again, because it was a different servicer on the

23  exhibits for today where it was contained, yes.

24  Q.  Do you know if the loan number that is on the documents

25  LoanCare keeps are -- is the same loan number that is included

M2sncitf                        Nichols - Cross

1   in the note for this file?

2   A.  I am not sure I understand that question.  Would you mind

3   rephrasing it.

4   Q.  Let me lay a foundation for it.  Did you review -- have you

5   had an opportunity to review the mortgage note for this matter?

6   A.  I looked at the mortgage note, yes, sir.  You mean -- I'm

7   sorry.  The promissory note, right?

8   Q.  Yes, the promissory note, exactly?

9   A.  Yes, sir.

10  Q.  I'm not --

11  A.  Yes, sir, I did.

12  Q.  You did have --

13  A.  I'm sorry.  If there is a question, it broke up.  I

14  apologize, sir.

15  Q.  So you did have an opportunity to review the promissory

16  note prior to today's testimony, correct?

17  A.  Yes, sir, I did, yes.

18  Q.  Are you aware whether the loan number used by LoanCare is

19  included on the promissory note or any of its allonges?

20  A.  I did not see that.  Again, LoanCare did not start

21  servicing this until 2018, which was, you know, well after the

22  promissory note was signed at origination.

23  Q.  How about this loan number by CIT Bank, the one ending in

24  2454?  Was that noted on any of the documents, the promissory

25  note or any of the allonges?

M2sncitf                    Nichols - Cross

1          MS. NICHOLSON:  Objection.

2    A.  I wasn't --

3          THE COURT:  Mr. Gomberg, I will allow the answer and

4    let's move on.  Again we're getting either repetitive or

5    cumulative.

6    A.  Certainly.  Mr. Gomberg, I was not isolating part of my

7    review to that particular loan number ending in 2454, so I do

8    not remember -- I did not look for that correlation or for it

9    to appear on that document.  So I can't answer it.

10   Q.  Okay.  You previously testified as to the -- I believe it

11   was this document, Exhibit 11, 90-day notice, among others,

12   that all of the documents in this exhibit were mailed with one

13   envelope, is that correct?

14   A.  Yes.

15   Q.  All right.  As litigation specialist -- apologies if I

16   misstated your title -- are you aware of the requirement to

17   have -- strike that.

18          Currently what is your company's practice as to

19   mailing 90-day notices with regards to what notices specific

20   language is included within the 90-day RPAPL 1304 notice?

21   A.  I am not part of, you know, the formulation of that

22   language.  Again, it is my understanding that there is -- it is

23   on file with the company that will -- Covius -- that will print

24   and handle the physical mailing of these, so I -- I do not know

25   the language.  I am not in that loop so to speak.

1    Q.  Are you aware whether LoanCare's business practices with

2    regards to 90-day notices have change within the past, since

3    the start of this action?

4    A.  I am not aware of any changes or basically what the

5    language currently is.

6              MR. GOMBERG:  One second, your Honor.  I believe

7    that's it.  Just to -- that is all I have, your Honor.

8              THE COURT:  Thank you.

9              Ms. Nicholson, do you have any further questions?

10             MS. NICHOLSON:  Just one question.

11   REDIRECT EXAMINATION

12   BY MS. NICHOLSON:

13   Q.  Mr. Nichols, in your experience in over a decade in the

14   mortgage servicing business, is it common that when a loan

15   transfers that the servicers, the investors, and each

16   transferee has a different loan number for that loan?

17   A.  Yes.  It is very common.

18             MS. NICHOLSON:  Thank you.

19             That is all.

20             THE COURT:  Thank you.  Mr. Nichols, you may exit at

21   this point.

22             THE WITNESS:  Am I excused?

23             THE COURT:  Yes, your Honor.

24             THE WITNESS:  Excellent.  Thank you, all.  Have a

25   great day.

M2sncitf

1              THE COURT:  Thank you.

2              THE WITNESS:  Thank you again.

3              THE COURT:  Ms. Nicholson, for the purposes of

4    planning ahead and determining what is next, what is your

5    contemplation of any further testimony from any other

6    witnesses?

7              MS. NICHOLSON:  Plaintiff rests, your Honor.

8              THE COURT:  All right.

9              MR. GOMBERG:  The defendant has no witnesses.

10             THE COURT:  I hear Ms. Nicholson indicates that the

11   plaintiff rests.

12             Mr. Gomberg, does the defendant intend to present a

13   direct case?

14             MR. GOMBERG:  The defendant has no witness, just

15   intending to provide closing.

16             THE COURT:  All right.  It's 12:20.  I will give each

17   of you five minutes for closing arguments, and then we will

18   adjourn.

19             THE COURT:  Ms. Nicholson.

20             MS. NICHOLSON:  Your Honor, Mr. Neris confirmed that

21   he did take out a mortgage and that he did stop paying on that

22   mortgage.  While he did not know the exact date, he did

23   establish that he did default on the mortgage and the

24   modifications as were shown in plaintiff's exhibits.

25             The testimony of Ms. Shulte and Mr. Nichols confirmed

M2sncitf

the existence of the note, the mortgage, the modification, and
that Mr. Neris defaulted on this note and modification.  The
witnesses testified that this plaintiff CIT Bank has been in
possession of the original note since prior to commencement of
this action.

They have provided business records showing possession
of the original note as well as providing the original note.
And it was attached to the summons and complaint since the time
that it was attached to the summons and complaint.  The witness
testified that it was adjusted as a negotiable instrument by
CIT Bank as the holder in due course.

Your Honor, the testimony of the witnesses shows that
the 90-day and 30-day notices were mailed.  Mr. Nichols
testified to the practices and procedures of Walz, or Covius,
formerly known as Walz; and Ms. Shulte testified to the
practices and procedures of CIT Bank in providing the data for
those mailings.

The proof that they were mailed was provided with the
transaction report as well as with the notices themselves,
which would not have been in existence if they had not been
mailed.

Additionally, Mr. Nichols testified as to the damages,
the unpaid principal balance, the interest, and the escrow
amounts that are due and owing as a result of Mr. Neris'
default.

M2sncitf

1          The conditions precedent were met.  The note and

2     mortgage were testified to, the default was testified to, as

3     were the damages.

4          Plaintiff has established its case for foreclosure in

5     this action.

6          Thank you.

7          THE COURT:  Thank you.

8          Mr. Gomberg.

9          MR. GOMBERG:  Your Honor, in order to meet the burden

10     for a plaintiff foreclosing, they must provide that they have

11     the note, the mortgage as well as the default date; in order to

12     prove the note being in possession, either physical possession

13     or by assignment.

14          And in this case by physical possession was not proven

15     among other reasons because there was no proof that provided

16     that the alloges were firmly affixed to the note, which is a

17     requirement, clear requirement pursuant to case law, OneWest v.

18     Rodriguez, 161 A.D.3d 715, which is a First Department -- first

19     Appellate Division -- First Appellate Department case.

20          Next, the note that was provided, at least the one

21     that was attached to the complaint had notations to it,

22     although it was certified as an original copy, had notations

23     that the loan number was circled.  There was also some notation

24     as to IBMOF or other letters that were included on it, which

25     the other note which was provided subsequently that was --

M2sncitf

which was the only one that was personally reviewed by any of

the witnesses two weeks prior to today's note it does not have

notations.  In fact, the only notation additionally that it has

does have is the voiding of a prior endorsement in blank, which

cannot be done by anybody other than the original endorser, let

alone after it was already endorsed, and specifically endorsed.

So the endorsements from the original complaint do not

line up.  There is an endorsement in blank that goes -- that

CIT Bank uses at its -- as its argument for physical possession

prior to the commencement of the action.  And ever since then

that same endorsement in blank was turned to into a specific

endorsement showing that -- with another endorsement in blank

to itself.

The note in this case for numbers of reasons -- for

those reasons is unable to meet the standard that's necessary

for possession of a note to meet the *prima facie* burden of a

foreclosure.  Otherwise, the assign -- the loan numbers that

were included on the note -- all of the note and all of their

allonges have one set of -- one loan number on it, only one

loan number.  Specifically, that loan number is -- just to be

clear here -- ending in 4183.

That loan number of 4183 is included in the original

note, in the allonge to the note to OneWest, in the allonge to

the note specifically to One -- to -- to CIT Bank as well as in

CIT Bank's own allonge to the note that's endorsed in blank.

M2sncitf

So CIT Bank created on it own allonge.  And on that allonge, it used the loan number ending in 4183.

The reason I bring this up and I harp on it so much, your Honor, is because the notices that were provided, which were also a condition precedent pursuant to 1304 as well as pursuant to contract law for the mortgage, and with the 90-day notice and the 30-day notice, none of those had the same loan number as was included in the note or any of its allonges. There was another note -- another loan number purportedly prepared by CIT Bank, and then there was another loan number purportedly prepared by LoanCare.

Again, the point of a notice is to provide the borrower with the note -- the 90-day notice, the 30-day notice -- provide the borrower of a breach or intent to foreclose on that mortgage.  The loan number not being the correct loan number for the mortgage thereby vitiates that ability to provide notice of that mortgage.

That's with regard to the 90-day notice and the 30-day notice being ineffective.

The mailing practices and procedures that were attested to were quite confusing, as it seems to be that CIT Bank was the ones who sent the notice, since the company that was hired, Walz, was only hired in 2018, after the action was commenced.

But notwithstanding, the first witness specifically

M2sncitf

1    testified they did not have any knowledge as to whether the

2    notice was all in one envelope or otherwise.  They stated that

3    they -- they explicitly stated themselves -- they admitted they

4    do not have knowledge of the mailing practices and procedures,

5    which is a clear requirement pursuant to Appellate Division law

6    in New York for proving condition precedent, strict compliance

7    with RPLAP 1304.

8              And, to be quick, the one additional note we

9    previously discussed prior to this trial is the requirement by

10   *Kessler* and the new case law, which shows that the notice as

11   provided pursuant 1304(2) relates that the notice has to be in

12   one envelope -- each notice provided in the 90-day notice has

13   to be in separate envelopes.  Thereby, having the bankruptcy

14   notice and the lender's notice in the same envelope, let alone

15   the same document, is a fatal defect.

16             Thank you, your Honor.

17             MS. NICHOLSON:  You are muted, your Honor.

18             THE COURT:  Ms. Nicholson, one minute to rebut.

19             MS. NICHOLSON:  Your Honor, the witnesses testified

20   that the loan number changes as the servicer and as the entity

21   changes.

22             That loan originated with IndyMac, then went to

23   OneWest, then went to CIT.  That loan number would change with

24   each of those iterations.

25             That is nothing unusual.  It is extremely common in

M2sncitf

1    the mortgage servicing industry, as both witnesses have

2    testified to.  Therefore, the fact that the loan number on the

3    note is not the same as on the notices is completely

4    irrelevant.  It is the same loan, and it is the same

5    information.

6             The -- as far as the 1304 notices, the mailings are

7    concerned, CIT -- the CIT witness testified to CIT's portion of

8    the mailing practices and procedures as they send the data to

9    Walz Covius, who they used as a vendor.  Mr. Nichols testified

10   to the fact that the 1304 and the 30-day demand letters on

11   Covius Walz' side, he's been trained by Covius Walz and has

12   seen the facility himself.  And he testified as to the mailing

13   practices and procedures once they received that data.  Walz

14   Covius was the vendor for both CIT and remains the vendor now

15   for LoanCare.  Both servicers have used that vendor.

16             As for CIT, CIT was both the servicer and the owner of

17   the notes.  They then subserviced to LoanCare as of -- after

18   commencement of the within foreclosure action.

19             The witnesses testified to possession of the original

20   note.  The CIT witness confirmed that the note was imaged as of

21   2007, as did the LoanCare witness with their acquisition

22   screen.

23             The note was attached to the summons and complaint in

24   the exact same manner that it existed at that time.  CIT as the

25   holder of the note in due course with a blank endorsement in a

M2sncitf

1   negotiable instrument, they have the ability to add allonges or

2   endorsements on that document, which they did, and they

3   testified that they did so between 2019 and 2020.

4        At this point in time, plaintiff rests.

5        THE COURT:  Thank you.

6        I am going to close the evidentiary portion of this

7   proceeding at this point.

8        We will hold the determination in abeyance pending the

9   resolution of the issue with which we began, which is the

10  defendants' motion to dismiss the case on the basis of the

11  recent Second Department rulings concerning the statutory

12  notice.

13       Plaintiff has one week to make a three-page

14  submission.

15       Within one week of the plaintiff's submission, the

16  defendant may submit a three-page response.

17       Thank you very much.

18       If there is nothing else, have a good day, and I will

19  look forward to receiving your follow-up.

20       Thank you.

21       MS. NICHOLSON:  Thank you, your Honor.

22       (Adjourned)

23

24

25

INDEX OF EXAMINATION

Examination of:                                        Page

STEPHANIE SHULTE

Direct By Ms. Nicholson  . . . . . . . . . . .13

Cross By Mr. Gomberg . . . . . . . . . . . . .62

Redirect By Ms. Nicholson  . . . . . . . . . .81

 RAMON NERIS

Direct By Ms. Nicholson  . . . . . . . . . . .86

Cross By Mr. Gomberg . . . . . . . . . . . . .92

 KEITH NICHOLS

Direct By Ms. Nicholson  . . . . . . . . . . .94

Cross By Mr. Gomberg . . . . . . . . . . . . 119

Redirect By Ms. Nicholson  . . . . . . . . . 131

PLAINTIFF EXHIBITS

Exhibit No.                                      Received

1   . . . . . . . . . . . . . . . . . . . . .17

2   . . . . . . . . . . . . . . . . . . . . .20

3   . . . . . . . . . . . . . . . . . . . . .21

4   . . . . . . . . . . . . . . . . . . . . .25

5   . . . . . . . . . . . . . . . . . . . . .27

6   . . . . . . . . . . . . . . . . . . . . .30

7   . . . . . . . . . . . . . . . . . . . . .30

8   . . . . . . . . . . . . . . . . . . . . .30

10  . . . . . . . . . . . . . . . . . . . . .32

9   . . . . . . . . . . . . . . . . . . . . .38

11   . . . . . . . . . . . . . . . . . .40

12   . . . . . . . . . . . . . . . . . .43

13   . . . . . . . . . . . . . . . . . .45

14   . . . . . . . . . . . . . . . . . .49

15   . . . . . . . . . . . . . . . . . .58

16   . . . . . . . . . . . . . . . . . .60

17   . . . . . . . . . . . . . . . . . 100

18   . . . . . . . . . . . . . . . . . 109

19   . . . . . . . . . . . . . . . . . 113

20   . . . . . . . . . . . . . . . . . 116

21   . . . . . . . . . . . . . . . . . 118